In re Se. Eye Ctr. (Pending Matters), 2021 NCBC 27A.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN RE SOUTHEASTERN EYE
CENTER-PENDING MATTERS

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1648

**AMENDED ORDER AND OPINION
ON MOTIONS FOR SUMMARY
JUDGMENT OR PARTIAL SUMMARY
JUDGMENT
(OLD BATTLEGROUND v. CCSEA)**

1.    **THIS MATTER** is before the Court on four motions for summary judgment or partial summary judgment filed by (i) Plaintiffs Old Battleground Properties, Inc. and Nivison Family Investments LLC[1] (partial summary judgment), (ECF No. 1377), (ii) the Receiver for JDPW Trust[2] (partial summary judgment), (ECF No. 1383); (iii) Defendant Douglas S. Harris ("Doug Harris") (summary judgment), (ECF No. 1380), and (iv) Defendants Richard Harris, Castle McCulloch Inc., and Historic Castle McCulloch, LLC[3] (summary judgment), (ECF No. 1374), (together, the "Motions").

2.    For the reasons set forth below, the Court (i) **DENIES** Plaintiffs' motion, (ii) **GRANTS in part** and **DENIES in part** the Receiver's motion, (iii) **DENIES** Doug Harris's motion, and (iv) **GRANTS in part** and **DENIES in part** the CM Defendants' motion.

---

[1] Old Battleground Properties, Inc. is referred to herein as "Old Battleground," Nivison Family Investments LLC is referred to as "NFI," and they are collectively referred to as "Plaintiffs."

[2] The JDPW Trust U/T/A Dated June 8, 2007 is referred to herein as "JDPW."

[3] Castle McCulloch Inc. is referred to herein as "Castle McCulloch," Historic Castle McCulloch, LLC is referred to as "Historic Castle," and together with Richard Harris, they are collectively referred to as the "CM Defendants."

*Smith Debnam Narron Drake Saintsing & Myers, L.L.P., by Byron L. Saintsing, for Plaintiffs Old Battleground Properties, Inc. and Nivison Family Investments, LLC.*

*Oak City Law LLP, by Robert E. Fields III and Samuel Pinero II, for Gerald A. Jeutter, Jr., as Receiver for JDPW Trust U/T/A Dated June 8, 2007, Central Carolina Surgical Eye Associates, P.A., HUTA Leasing LLC, Southeastern Eye Management, Inc., Southeastern Cataract Laser Center, PLLC, EMS Partners, LLC, KEPES Newco, LLC, and DRE Newco, LLC.*

*Wyatt Early Harris Wheeler LLP, by Scott F. Wyatt and Donavan J. Hylarides, for Defendants Richard A. Harris, Historic Castle McCulloch, LLC, and Castle McCulloch, Inc.*

*Law Offices of Richard M. Greene, by Richard M. Greene, for C. Richard Epes.*

*Douglas S. Harris, Pro se.*

Bledsoe, Chief Judge.

I.
BACKGROUND

A. Factual Background

3.     The Court does not make findings of fact when ruling on a motion for summary judgment, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975).

4.     This action represents part of a large group of cases before the Business Court that have been consolidated into two files: *In re Se. Eye Ctr.-Pending Matters* (15 CVS 1648, Wake County) and *In re Se. Eye Ctr.-Judgments* (12 CVS 11322, Guilford County). The extensive background of these cases is set forth in previous

orders and opinions. The Court recites only the factual background relevant to the issues presented in these Motions.

5.      Defendant Central Carolina Surgical Eye Associates, P.A. ("CCSEA") is a North Carolina medical services professional association located in Guilford County, North Carolina. (*See* Am. Consolidated Compl. ¶ 3, ECF No. 179.) James Mark McDaniel, Jr. ("McDaniel") was the chief executive officer of CCSEA, and Dr. C. Richard Epes ("Dr. Epes") was an interest owner in CCSEA. (*See* Am. Consolidated Compl. ¶¶ 8, 10, 24, Exs. A, B, ECF No. 180.) Beginning in 2002, McDaniel and Dr. Epes took out three loans with NewBridge Bank ("NewBridge")[4] to fund CCSEA and other related entities (the "CCSEA Loans").[5]

6.      In 2004, NewBridge loaned approximately $2 million (the "CM Loan") to Castle McCulloch, Historic Castle, and NSITE Management, LLC ("NSITE"), three additional entities with ties to McDaniel and Dr. Epes. The CM Loan was represented by a promissory note executed by Castle McCulloch, Historic Castle, and NSITE in favor of NewBridge (the "CM Note"). (*See* ECF No. 1384.12; *see also* Am. Consolidated Compl. Ex. N, ECF No. 183.) At all times relevant, Castle McCulloch and Historic Castle were owned and managed, either in whole or substantial part, by Richard Harris, brother of Doug Harris. (*See* Harris Dep. 31:6–24, 47:12–14, 49:8–

---

[4] NewBridge's predecessor in interest was FNB Southeast, and some documents in the record refer to that entity instead of NewBridge; the Court refers to both in this Order and Opinion as "NewBridge."

[5] Although this action involves the CCSEA Loans, they are not the subject of the instant Motions, and the Court will not recite the facts of record that bear only on those Loans.

51:23, 53:10–25, 55:2–25;[6] Am. Consolidated Compl. ¶¶ 14, 15.) As relevant here, the CM Note was secured by two forms of collateral (the "CM Collateral"): a deed of trust from Historic Castle in favor of NewBridge (the "CM Deed"),[7] (*see* ECF No. 1384.11), and an assignment of leases and rents granted by Historic Castle in NewBridge's favor (the "CM Assignment"),[8] (*see* ECF No. 1384.10).

7.      By mid-2012, the CM Loan and the CCSEA Loans were in default, with a combined outstanding balance of over $3.3 million. (*See* Am. Consolidated Compl. Ex. X ["Settlement Agrmt."] at 2, ECF No. 185.) To partially collect on these loans, NewBridge agreed to a settlement with the CM Defendants, NSITE, McDaniel, Dr. Epes, and other involved parties. Under the settlement, the debtors arranged for NewBridge to sell the involved loan documents, including the CM Loan, Note, and Collateral, to a third party for a discounted price. (*See* Settlement Agrmt. at 1–6.)

8.      That third party was JDPW. At all times relevant, Doug Harris (Richard Harris's brother) was the trustee of JDPW. (*See* Receiver's Cross Claims Against Douglas Harris ["Receiver's Cross-cls."] ¶ 434, ECF No. 716; Douglas S. Harris's Ans. Cross Claims ["Harris Ans. Cross-Cls."] ¶ 434, ECF No. 739.) JDPW was formed by Dwight Cox ("Cox") as a revocable trust under a trust agreement dated June 8, 2007 (the "Trust Agreement"). (*See* Revocable Tr. Agrmt. Clement Dwight Cox ["Tr.

---

[6] For ease of reference, the excerpts of Doug Harris's deposition testimony appear at ECF Nos. 887, 1379, 1385.6, 1394.11, 1397.1, and 1409.3.

[7] The CM Deed is dated September 30, 2004, and was recorded on October 4, 2004 in Book 6182, Pages 2233–46 at the Guilford County Register of Deeds.

[8] The CM Assignment is dated September 30, 2004, and was recorded on October 4, 2004 in Book 6182, Pages 2247–59 at the Guilford County Register of Deeds.

Agrmt."] at 4, ECF No. 1376.4.) Doug Harris was appointed trustee. (*See* Tr. Agrmt. ¶ VI.) The Trust Agreement designated Cox as the trust's beneficiary for the remainder of his lifetime. (*See* Tr. Agrmt. ¶ V.) It further provided that upon Cox's death, JDPW would become irrevocable and that Cox's wife, Kay Harris Turner ("Turner"), would become the primary beneficiary. (*See* Tr. Agrmt. ¶ XIII(P), (R).) Upon her death, any remaining trust property was to be distributed to Cox's heirs at law. (*See* Tr. Agrmt. ¶ XIII(R).)

9. With respect to property held by JDPW, the Trust Agreement stated that Cox had transferred "all of his interest in the property described in Schedule A" to serve as the "Trust Property." (Tr. Agrmt. ¶ II.) But while the Trust Agreement contained boilerplate language that "[t]he Trustee hereby acknowledges receipt of the Trust Property," (Tr. Agrmt. ¶ II), no Schedule A is attached to the Trust Agreement in the evidentiary record and one has never been produced. Additionally, Doug Harris has confirmed that the only document relating to JDPW's creation that he had as trustee was the Trust Agreement. (*See* Harris Dep. Ex. 79, ECF No. 1379.) Doug Harris also testified that JDPW never had a bank account and that the only funds that ever came into JDPW's possession were those in connection with the transactions at issue in this case. (*See* Harris Dep. 822:18–823:14.)

10. The only evidence of any property transferred into JDPW during Cox's lifetime relates to several poker machines. Doug Harris testified that shortly after JDPW was formed, "Cox put some poker machines into it that he owned, and his purpose was to resell them." (Harris Dep. 611:12–14.) However, Doug Harris was

not involved in these purported transactions because "Cox was still alive when they [the poker machines] were sold and he handled that himself." (Harris Dep. 823:16–17.) In Doug Harris's view, "technically speaking, they were trust stuff, but, you know, he [Cox] was doing with them what he wanted to do with them, and I let it be." (Harris Dep. 823:17–19.) It is unclear whether Cox eventually sold all or only some of the machines. (*See* Harris Dep. 823:20–824:3.)

11. In any event, Doug Harris never saw the machines or took possession or control of them as trustee. There also appears to be no paper documentation purporting to transfer them from Cox to JDPW. (*See* Harris Dep. 824:4–20.) According to Doug Harris, the machines "never got physically in the possession of the trust. And really, other than, you know, some notes to me saying that's what he [Cox] was going to do, I never heard anything about that." (Harris Dep. 824:9–12.)

12. The record is undisputed that Doug Harris never made any distributions out of JDPW to any beneficiary. (*See* Harris Dep. 826:9–17.) It is also undisputed that by 2012, JDPW held no assets. (*See* Harris Dep. 827:17–24.) In fact, JDPW remained more or less inactive until 2012. (*See* Harris Dep. 824:25–825:2.)

13. In 2012, Doug Harris saw JDPW as a potential vehicle to aid in a plan to refinance the CM Loan and CCSEA Loans, specifically to help his brother reorganize his businesses and minimize tax consequences. (*See* Harris Dep. 229:1–25, 829:17–830:14.) During this time, Richard Harris had retained Doug Harris, who was a licensed attorney, to represent him in negotiating the refinancing deal. (*See* Harris Dep. 229:7–12; Receiver's Cross-cls. ¶ 434; Harris Ans. Cross-Cls. ¶ 434.) As

explained more thoroughly below, the plan essentially entailed JDPW's purchase of the CM Loan and the CCSEA Loans from NewBridge, with that purchase to be funded by a loan from Arthur Nivison ("Nivison"), who managed Plaintiffs Old Battleground and NFI. (*See* ECF No. 879, Ex. 3 ["Nivison Aff."] ¶¶ 1, 11.)

14. Before bringing JDPW into the picture, Doug Harris made arrangements for himself personally. In July 2012, Doug Harris—in his individual capacity—entered into two agreements: one with Dr. Epes (the "Epes Agreement") and one with McDaniel, CCSEA, and a variety of other entities (the "McDaniel Agreement"). (*See* ECF No. 1384.4 ["Epes Agrmt."] at 1; ECF No. 1384.5 ["McDaniel Agrmt."] at 1.) In each agreement, Doug Harris promised to cause JDPW to buy the CM Loan from NewBridge. (*See* Epes Agrmt. ¶ 1; McDaniel Agrmt. ¶ 1.) In exchange, Dr. Epes (in the Epes Agreement) and McDaniel and certain companies (in the McDaniel Agreement) promised to pay Doug Harris $1.3 million plus eight percent interest for two years. (*See* Epes Agrmt. ¶ 3; McDaniel Agrmt. ¶ 3.) In the Epes Agreement, the $1.3 million would be paid "in consideration of" Doug Harris's personal waiver of "all claims against Dr. Epes or his corporations." (Epes Agrmt. ¶ 3.) In the McDaniel Agreement, the $1.3 million would be paid "in consideration of" Doug Harris's personal waiver of "all past-due attorneys' fees, costs, and any claims of stock or legal interest in EMS Partners." (McDaniel Agrmt. ¶ 3.) This $1.3 million purportedly represented the amount still owed on the CM Loan. (*See* Epes Agrmt. ¶ 3; McDaniel Agrmt. ¶ 3.) It appears that the $1.3 million promised in each agreement are one and

the same, not two separate amounts totaling $2.6 million. (*See* Claim Doug Harris Against the Receivership ["Harris Receivership Claim"], ECF No. 1385.8.)

15. The agreements also provided that Dr. Epes "or his corporations" (in the Epes Agreement) and "McDaniel and the corporations" (in the McDaniel Agreement) would "make all payments to Nivison" and would take actions "such that JDPW Trust is released from any obligation to Nivison and/or his corporations." (Epes Agrmt. ¶ 3; McDaniel Agrmt. ¶ 3.) This appears to be a reference to the contemplated loan Nivison would make to JDPW. Doug Harris also received confessions of judgment from Dr. Epes, McDaniel, and the companies, which he was permitted to file in the event that (i) payments were not made such that JDPW was sued by Nivison for default, (ii) JDPW was not released from its contractual relationship with Nivison, or (iii) Doug Harris was not paid within two years. (Epes Agrmt. ¶ 6; McDaniel Agrmt. ¶ 5; *see also* ECF Nos. 1384.14, 1384.15.) JDPW was not a party to these agreements, nor were NewBridge, Plaintiffs, the CM Defendants, or Nivison.

16. After executing those agreements, Doug Harris and McDaniel met with Nivison about providing a loan to JDPW to fund JDPW's purchase of the CM Loan and the CCSEA Loans from NewBridge. (*See* Nivison Aff. ¶ 11; Harris Dep. 75:14–23, 79:11–25.) Eventually, it was agreed that either Old Battleground or NFI would lend JDPW the necessary funds.[9]

17. On September 21, 2012, Nivison and JDPW, through Doug Harris as trustee, memorialized their agreement (the "Assignment Agreement"), which

---

[9] It is disputed whether Old Battleground or NFI was ultimately supposed to be the lender, but resolution of that issue is not necessary to a determination of the Motions.

represented a $2.1 million loan from Nivison and his companies to JDPW (the "Nivison Loan"). Plaintiffs contend that Doug Harris also executed a promissory note on JDPW's behalf, (*see* Am. Consolidated Compl. Ex. DD, ECF No. 187), but Doug Harris denies signing the note, (*see* Am. Consolidated Compl. ¶ 53; Def. Douglas S. Harris's & JDPW Trust's Ans. Am. Consolidated Compl. ¶ 53, ECF No. 221).

18. The parties dispute many of the final terms of the Assignment Agreement and the validity of certain documents that purport to set forth its terms. It is undisputed, however, that both versions of the Assignment Agreement provided that the agreement was "made . . . for the purpose of transferring the security interest in the personal property of HUTA Leasing Company, Southeastern Eye Management, Inc., and Central Carolina Surgical Eye Associates, P.A., now held by NewBridge Bank, to [either a legal entity designated by Old Battleground, or, in the second version of the agreement, to NFI] in exchange for [a] $2,100,000.00 loan to JDPW Trust which loan will be used to purchase NewBridge Bank's security interest." (*Compare* ECF No. 1384.2 ["9AM Agrmt."], *with* Am. Consolidated Compl. Exs. QQ, TT, ECF No. 190.)

19. On the same day, JDPW, through Doug Harris as trustee, purchased the CM Loan from NewBridge, acquiring all right, title, and interest to both the CM Note and the CM Collateral. (*See* Bill of Sale, ECF No. 1384.8; Assignment Security Instruments, ECF Nos. 1384.6, 1385.1.)[10]

---

[10] NewBridge's assignment of the CM Deed and CM Assignment to JDPW is dated September 21, 2012, and was recorded on October 29, 2012 in Book 7407, Pages 2781–83 at the Guilford County Register of Deeds.

20.     However, several problems arose after these September 2012 transactions. It is undisputed that JDPW never had the funds to repay the Nivison Loan, failed to repay the loan, and entered into default. (*See* Am. Consolidated Compl. Ex. GGG ["Partial Summ. J. Ord."] at 2, ECF No. 194; Demand Letter, ECF No. 1384.26; Harris Dep. 540:2–14.) It is also undisputed that Doug Harris never took any action to leverage JDPW's rights to the CM Loan. He never sought to collect on the CM Note or foreclose on the CM Collateral, and JDPW never received any payments from Dr. Epes or McDaniel and his companies, contrary to Doug Harris's personal arrangements under the Epes and McDaniel Agreements. (*See* Harris Dep. 454:6–24.) According to Doug Harris, the reason he never sought to recover any payments was because the circumstances "probably just sort of drifted along somewhat." (Harris Dep. 454:23–24.) Doug Harris had also expected that JDPW might make a profit in the form of a two percent interest spread on the difference between the rates of the CM Loan and the Nivison Loan, but it appears that spread never materialized. (*See* Harris Dep. 230:1–20, 828:3–829:14.)

21.     Then in March 2013, Doug Harris, acting as JDPW's trustee, effectively transferred the CM Loan, Note, and Collateral to his brother, Richard Harris. (*See* Harris Dep. 34:1–11.) Specifically, he signed over to Historic Castle a deed (the "CM Release Deed") that released the CM Collateral: both the real property encumbered by the CM Deed and the rights to leases and rents under the CM Assignment. (*See* ECF No. 1385.4; Harris Dep. 866:19–868:25; *see also* Am. Consolidated Compl. Ex.

YY, ECF No. 192.)[11]  He also assigned to Richard Harris all of JDPW's rights under the CM Note.  (*See* Harris Dep. 628:12–635:25.)  In Doug Harris's own words, "I assigned any and all other rights under the note to him [Richard Harris], so he'd be in control of it instead of anybody else.  For whatever--since 2004, for eight years, those rights had been assigned to NewBridge Bank.  It was my purpose to cancel each and every one of those rights because that was the deal." (Harris Dep. 633:1–5.)  With those transfers effected, JDPW lost all rights to the CM Loan, Note, and Collateral but remained obligated on the Nivison Loan.

## B.  Procedural Background

22.    In July 2014, NFI filed suit against Doug Harris, individually and as trustee of JDPW, and against NewBridge.  A few months later, Old Battleground and NFI together filed suit against CCSEA, various CCSEA-affiliated entities, Dr. Epes and his wife, and McDaniel and his wife.

23.    In the second lawsuit, upon the parties' joint request, the Court appointed Gerald A. Jeutter, Jr. as a receiver (the "Receiver") for CCSEA and several of its affiliated entities (the "Receivership Entities").  *See generally Old Battleground Props., Inc. v. Cent. Carolina Surgical Eye Assocs., P.A.*, 2015 NCBC LEXIS 19 (N.C. Super. Ct. Feb. 25, 2015).  Following his appointment, the Receiver investigated and asserted claims and demands on behalf of the Receivership Entities against Dr. Epes and his wife.  As the litigation in these two cases has progressed, the number of

---

[11] The CM Release Deed is dated March 15, 2013, and was recorded on April 14, 2015, in Book 7691, Pages 2387–89 at the Guilford County Register of Deeds.

entities in receivership and the number of cases related to CCSEA and other parties have grown.

24. In June 2015, the Court consolidated these two lawsuits with several other related pending cases and directed that all subsequent filings be made in this case. (*See* Ord. Mot. Consolidate 8–9, ECF No. 76.) The Court also required all persons asserting claims against CCSEA or its affiliated entities to file their claims with the Receiver. (*See* Case Management Ord. 5–8, ECF No. 82.)

25. Shortly after consolidation, the Court approved a settlement between the Receiver and the Epeses. (*See* ECF No. 117.) In July and August 2015, Plaintiffs sought leave to amend their complaints in each of their lawsuits. The Court ordered the two lawsuits further consolidated for future proceedings and directed Plaintiffs to file a single amended consolidated complaint. (*See* ECF No. 168.) Plaintiffs filed their amended consolidated complaint in September 2015, which added the CM Defendants to the case. (*See generally* Am. Consolidated Compl.)

26. In April 2016, on Plaintiffs' motion, the Court placed JDPW into receivership by appointing the Receiver as receiver for JDPW. (*See* Ord. Approving Pls.' Mot. Appointment Receiver JDPW Trust ["JDPW Receiver Ord."], ECF No. 472.) The Court did so after finding and concluding for the limited purposes of that motion that, among other things, (i) Doug Harris had a conflict of interest in remaining in control of JDPW and making decisions on its behalf; (ii) Doug Harris was unlikely to investigate and pursue possible claims JDPW might have against the CM Defendants, including his brother; and (iii) there was no perceived conflict of interest

in the Receiver serving as the receiver for both JDPW and the Receivership Entities. (*See* JDPW Receiver Ord. 5–6.) The Court also enjoined Doug Harris from conducting any further business as trustee of JDPW. (*See* JDPW Receiver Ord. 17.)

27. Along with placing JDPW into receivership, the Court also approved a settlement agreement between Plaintiffs, the Receivership Entities, and JDPW. Among other things, the settlement allowed Plaintiffs a $2.1 million claim against JDPW, arising out of the Nivison Loan for the same amount. (*See* Ord. Approving Nivison Settlement & Related Transactions ["Ord. Approving Nivison Agrmt."] at 8, ECF No. 471.) This represented a substantial reduction from the amount originally sought by Plaintiffs against JDPW. (*See* Ord. Approving Nivison Agrmt. 8.) Plaintiffs voluntarily dismissed their claims against the Epeses in June 2016 and dismissed their claims against NewBridge several months later.

28. In February 2017, Plaintiffs, Nivison, Doug Harris, and the CM Defendants all filed motions for summary judgment. After a stay pending resolution of an interlocutory appeal to the Supreme Court of North Carolina, the Court held a hearing on the motions. In May 2019, the Court ruled on the motions in a published opinion that narrowed the remaining claims. *See In re Se. Eye Ctr.-Pending Matters*, 2019 NCBC LEXIS 29 (N.C. Super. Ct. May 7, 2019). The case was then set for a December 2019 trial. (*See* ECF No. 1171.)

29. However, subsequent developments delayed trial. In August 2019, Turner, represented by Doug Harris, moved to intervene in this case in her purported capacity as the beneficiary of JDPW. She also sought to remove Plaintiffs' $2.1 million allowed

claim against JDPW and to have JDPW removed from receivership. In January 2020, the Court disqualified Doug Harris as Turner's counsel and struck Turner's motions without prejudice to her refiling them when represented by other counsel. *See generally In re Se. Eye Ctr.-Pending Matters*, 2020 NCBC LEXIS 12 (N.C. Super. Ct. Jan. 30, 2020). Turner obtained new counsel and refiled her motions. In August 2020, the Court granted Turner's motion to intervene but denied her motion to set aside the $2.1 million claim and remove JDPW from receivership. *See generally In re Se. Eye Ctr.-Pending Matters*, 2020 NCBC LEXIS 95 (N.C. Super. Ct. Aug. 17, 2020). Even though the Court granted Turner permission as an intervenor "to seek to protect her claimed interest in the [JDPW] Trust as she deems appropriate[,]" *id.* at *8, Turner has not made any filings in this case since.

30.    In October 2020, the Court held a status conference. At the conference, Plaintiffs' counsel and the Receiver's counsel informed the Court that while the deadline for dispositive motions had expired, they wished to file additional summary judgment motions in an effort to streamline and clarify the matters remaining for trial. Counsel noted that this additional round of motions could be particularly beneficial given that a trial would likely be delayed for some time due to the ongoing COVID-19 pandemic. After hearing from all parties, the Court decided to permit any party to file a dispositive motion and set a briefing schedule accordingly. (*See* ECF No. 1347.)

31.    Plaintiffs, the Receiver, Doug Harris, and the CM Defendants filed the Motions on this second round. Although permitted to intervene, Turner did not file

any briefs supporting or opposing any of the Motions, even though the Motions raise issues directly implicating JDPW's validity and her status as a beneficiary. Turner's counsel also did not appear at the hearing on the Motions.

32. The Court held a hearing on the Motions on February 11, 2021, via WebEx videoconference, at which counsel for all parties who filed a motion or a response to a motion were present. The Motions are now ripe for resolution.

II.
LEGAL STANDARD

33. Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c); *see also Da Silva v. WakeMed*, 375 N.C. 1, 10 (2020). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369 (1982). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' and means 'more than a scintilla or a permissible inference.' " *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 8 (2018) (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335 (2015)). The Court views all evidence "in the light most favorable to the non-moving party." *Da Silva*, 375 N.C. at 10.

34. The moving party bears the burden of proving that there is no genuine issue of material fact. *See Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002).

The moving party may meet this burden: (1) "by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense"; or (2) "by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim." *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "If the movant successfully makes such a showing, the burden then shifts to the nonmovant to come forward with specific facts establishing the presence of a genuine factual dispute for trial." *Pennington*, 356 N.C. at 579. The responding party may not "rest upon the mere allegations or denials" within its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." N.C. R. Civ. P. 56(e).

35. When the party with the burden of proof moves for summary judgment, the movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *see also Kidd v. Early*, 289 N.C. 343, 370 (1976).

III.
ANALYSIS

36. Plaintiffs' motion seeks summary judgment declaring: (i) that JDPW is invalid as an express trust under the North Carolina Uniform Trust Code (the "Uniform Trust Code"), and (ii) that a resulting or constructive trust should be imposed in Plaintiffs' favor as to the CM Note and CM Collateral. (*See* Pls.' Mot. Partial Summ. J., ECF No. 1377; Pls.' Br. Supp. 9–16, ECF No. 1378.)

37. The motions filed by the Receiver, Doug Harris, and the CM Defendants overlap substantially, primarily seeking summary judgment on a number of the Receiver's crossclaims asserted on behalf of JDPW. Additionally, the CM Defendants' motion seeks affirmative summary judgment on several of their own crossclaims. (*See* Receiver's Mot. Summ. J., ECF No. 1383; Receiver's Br. Supp., ECF No. 1386; Harris Mot. Summ. J., ECF No. 1380; Harris Br. Supp., ECF No. 1381; CM Defs.' Mot. Summ. J., ECF No. 1374; CM Defs.' Br. Supp., ECF No. 1375.)

38. The Court will begin its analysis by addressing Plaintiffs' motion. The Court will then turn to the Receiver's, Doug Harris's, and the CM Defendants' motions as to the Receiver's crossclaims. Finally, the Court will address the remainder of the CM Defendants' motion regarding their own crossclaims.

A. Plaintiffs' Motion

39. As noted, Plaintiffs' motion seeks summary judgment on two discrete issues: first, that JDPW is invalid as an express trust; and second, that a resulting or constructive trust should be imposed in Plaintiffs' favor as to the CM Loan and CM Collateral. They contend that JDPW is not (and perhaps never was) a valid, express trust because (i) Cox never transferred any property into JDPW before his death; (ii) even if Cox transferred property into JDPW, the trust was empty at his death; or (iii) JDPW failed as an express trust upon Cox and Turner's divorce. (*See* Pls.' Br. Supp. 9–16.)

40. The CM Defendants oppose the motion, first contending that the doctrine of judicial estoppel bars Plaintiffs from denying the validity of JDPW. (*See* CM Defs.'

Resp. Pls.' Mot. Partial Summ. J. 1–5, ECF No. 1391.) Because applying judicial estoppel would preclude Plaintiffs' motion in whole, the Court begins with that issue.

41. "Judicial estoppel 'protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Powell v. City of Newton*, 364 N.C. 562, 568 (2010) (alteration omitted) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). The Court may invoke the doctrine to "prevent[ ] a party from acting in a way that is inconsistent with its earlier position before the court." *Id.* at 569 (citing *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 28–29 (2004)). The doctrine "serve[s] to moderate the unjust results that would follow from the unbending application of common law rules and statutes." *Id.* (quoting *Brooks v. Hackney*, 329 N.C. 166, 173 (1991)).

42. Judicial estoppel is an equitable doctrine that may be invoked in the Court's sound discretion. *See id.*; *Whitacre P'ship*, 358 N.C. at 38–39. It is "inherently flexible[,]" and there is no mechanical test to determine its application. *Powell*, 364 N.C. at 569 (quoting *Whitacre P'ship*, 358 N.C. at 28). Nevertheless, our Supreme Court has observed that when determining whether to invoke the doctrine,

> three frequently considered aspects of a case are whether: (1) the party's subsequent position is "clearly inconsistent with its earlier position"; (2) judicial acceptance of a party's position might threaten judicial integrity because a court has previously accepted that party's earlier inconsistent position; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party" as a result.

*Id.* at 569 (quoting *Whitacre P'ship*, 358 N.C. at 29). The first factor—whether the party has taken a clearly inconsistent position—is "the only factor that is an essential element which must be present for judicial estoppel to apply[.]" *Wiley v. United Parcel*

*Serv., Inc.*, 164 N.C. App. 183, 188 (2004); *see also Whitacre P'ship*, 358 N.C. at 29 n.7; *Price v. Price*, 169 N.C. App. 187, 190 (2005). Additionally, "a reasonable justification for a party's change in position" may weigh against application of the doctrine. *Whitacre P'ship*, 358 N.C. at 34.

43. In its discretion, the Court concludes that judicial estoppel applies here. Plaintiffs' newly asserted position that JDPW is invalid as an express trust is clearly inconsistent with the position it has maintained over the almost seven years since Plaintiffs commenced these cases. Plaintiffs have consistently maintained that JDPW was at the center of the transactions at issue, and they should not be permitted to pivot to a new theory during this second round of dispositive motions.

44. In fact, it was not until the Receiver raised the question of JDPW's validity in September 2019 during the course of briefing Turner's first motion to intervene that Plaintiffs began questioning JDPW's validity. (*See* Receiver's Resp. Kay Turner Mot. Intervene 1–4, ECF No. 1201; Scheduling Ord. & Am. Notice Hearing ["Scheduling Ord."], ECF No. 1240; Pls.' & Receiver's Joint Mem. L. Addressing Suppl. Issues ["Pls.' Suppl. Br."], ECF No. 1254.) Notably, after the Receiver alerted the Court to the issue, the Court specifically requested supplemental briefing on whether any estoppel principles applied to the question of JDPW's validity. (*See* Scheduling Ord. ¶ 5(a)(i)(4).) But Plaintiffs declined to address the issue, stating they would not do so unless another party were to "articulate a purported basis for an estoppel as to the existence of an express trust[.]" (Pls.' Suppl. Br. 12–13.) In other

words, even once they began questioning JDPW's validity, Plaintiffs delayed by failing to meaningfully engage with the estoppel issue when asked to do so.[12]

45. Plaintiffs admit that the existence and validity of JDPW has been a fundamental assumption throughout this case. (*See* Pls.' Reply Br. 2, ECF No. 1403 ("The fact remains that all of the parties and this Court have relied upon Doug Harris's continuous assertions that JDPW Trust was a valid express trust.").) Despite this concession, they contend that they are not taking a clearly inconsistent position because, as they put it, their focus has been on their dealings with Doug Harris as JDPW's trustee, without regard to JDPW's validity. They contend they had no obligation to investigate his authority or JDPW's validity. *See* N.C.G.S. § 36C-10-1012(b) ("A person other than a beneficiary who in good faith deals with a trustee is not required to inquire into the extent of the trustee's powers or the propriety of their exercise."); *id.* § 36C-10-1012(d) ("A person other than a beneficiary . . . who in good faith and for value deals with a former trustee, without knowledge that the trusteeship has terminated is protected from liability as if the former trustee were still a trustee.").

46. Although those statutes may afford certain protections to Plaintiffs in their dealings with Doug Harris and JDPW, they do not give Plaintiffs the right to ignore questions about JDPW's validity during litigation and then later seek to change

---

[12] Additionally, simply because the Court requested supplemental briefing on JDPW's validity does not mean the Court is obligated to directly resolve that issue. Indeed, in permitting this second round of dispositive motions, the Court specifically stated that "[t]he Court's decision to permit the filing of dispositive motions after the expiration of the dispositive motion deadline does not restrict or limit any defense a party may wish to make in response to such a motion, including on grounds of timeliness." (ECF No. 1347 ¶ 6(b).)

positions. The issue for purposes of judicial estoppel is the consistency of Plaintiffs' position *during litigation*, not what assumptions they were entitled to make in their dealings *prior to litigation*. Those statutory shields in no way absolve Plaintiffs and their counsel from their obligation during litigation to thoroughly investigate issues and raise them in a timely fashion.

47. Timeliness is the key issue here, and Plaintiffs' new position is not timely. They argue that they were not on notice about doubts as to JDPW's validity until recently. They point to August 2019, when Turner intervened in this case and was deposed, as the first time they became aware of facts suggesting JDPW was never a valid trust. (*See* Pls.' Br. Supp. 2–3, 7–8.) But the record reveals otherwise. The evidence Plaintiffs primarily rely on is not Turner's testimony but rather Doug Harris's testimony and the Trust Agreement, which have been in the record for almost five years. (*See* Pls.' Br. Supp. 3–5, 7, 10–14.)

48. Doug Harris was deposed from March 2015 to June 2016—several years before Plaintiffs asserted this new position. His testimony was more than sufficient to put Plaintiffs—or any party—on notice of questions about JDPW's validity. Doug Harris testified that JDPW never had a bank account and that the only funds that ever came into JDPW were those in connection with the transactions at issue in this case—which occurred long after Cox had passed away. (*See* Harris Dep. 822:18–823:14.) He also testified that he never received or took physical possession of the poker machines that Cox purportedly transferred into JDPW. (*See* Harris Dep. 824:4–20.) He further stated that it was possible that all of the poker machines were

sold by Cox before his death. (Harris Dep. 823:16–824:3.) Doug Harris made clear that he never made any distributions out of JDPW to any beneficiary, (*see* Harris Dep. 826:9–12), and that by 2012, JDPW held no assets and was essentially inactive until 2012, (*see* Harris Dep. 824:25–825:2, 827:17–24).

49. Moreover, in February 2015, Doug Harris certified that the Trust Agreement (without an attached Schedule A) was the sole document in his possession relating to JDPW's creation. (*See* Harris Dep. Ex. 79.) That alone should have raised questions about whether a Schedule A ever existed. Plaintiffs also had access to Nivison's 2015 deposition, in which he testified that JDPW was "simply an empty vehicle being used for tax purposes." (Nivison Dep. 102:4–6, ECF No. 1392.1.) Thus, the record contained sufficient evidence to put Plaintiffs on notice long ago to investigate JDPW's validity if they deemed it prudent and advantageous to do so.

50. Plaintiffs argue that Turner's recent deposition "exposed" that JDPW was not a valid trust. (Pls.' Reply Br. 2.) Yet Turner's testimony only corroborates Doug Harris's earlier testimony; it adds nothing new. Plaintiffs cite to testimony by Turner that JDPW was never funded, that she never received any distributions from it, and that Cox intended to place unidentified real property into the trust but never did. (*See* Turner Dep. 16:21–19:22, ECF No. 1379.) That testimony simply duplicates Doug Harris's earlier testimony.[13]

---

[13] It is unclear whether the parties were aware that Cox and Turner divorced in 2007 until Turner was deposed. But in any event, their divorce would not have terminated the trust. As discussed more thoroughly later in this Order and Opinion, their divorce did not terminate the trust; it simply terminated Turner's status as a beneficiary under the trust.

51. Not only is Plaintiffs' position clearly inconsistent and untimely, but JDPW's existence has formed the basis for much of the litigation so far such that accepting this new position "might threaten judicial integrity[.]" *Powell*, 364 N.C. at 569 (citing *Whitacre P'ship*, 358 N.C. at 29). Indeed, to say the parties and the Court have relied on JDPW's validity is a vast understatement. JDPW was one of the first parties Plaintiffs sued, and neither their complaint against JDPW nor their suit against CCSEA and its related entities raised any questions as to JDPW's validity. More importantly, the now-operative pleading, Plaintiffs' amended consolidated complaint, relies heavily on JDPW's existence and role in the transactions and events at issue. It even seeks to recover from JDPW. (*See, e.g.*, Am. Consolidated Compl. ¶¶ 12, 13, 49, 54, 67, 112–17.) Plaintiffs have also pursued claims against the CM Defendants based on a theory in part premised on Plaintiffs' contract with JDPW. (*See, e.g.*, Am. Consolidated Compl. ¶¶ 168–81, 229–36, 248–53, 332–40.) And at no point have Plaintiffs sought to amend any of their pleadings to reflect questions about JDPW's validity.

52. Furthermore, the Court has awarded partial relief to Plaintiffs on the basis of JDPW's existence and involvement. (*See* Partial Summ. J. Ord. 1–3.) The Court placed JDPW into receivership, on Plaintiffs' own motion, and authorized the Receiver to bring claims on its behalf and to deal with claims against it. (*See generally* Pls.' Mot. Appointment Receiver JDPW Trust, ECF No. 305; JDPW Receiver Ord.) The Court approved a settlement between Plaintiffs and JDPW. (*See generally* Ord. Approving Nivison Agrmt.) And the Court issued a 159-page summary judgment

order and opinion that detailed and relied on JDPW's role throughout the events and transactions at issue to resolve the issues presented. *See generally In re Se. Eye Ctr.-Pending Matters*, 2019 NCBC LEXIS 29.

53. This case is in its late stages. Discovery closed long ago. The Court has already ruled on one round of summary judgment motions. If not for the COVID-19 pandemic and related delays, this case would have already gone to trial without this second round of dispositive motions. For the Court to now determine that JDPW is not a valid trust would likely unravel the years of progress made in this litigation.

54. In fact, because all parties have operated on the assumption that JDPW is a valid trust, there is no harm in continuing with that premise and no material prejudice to Plaintiffs. As they admit, they dealt with Doug Harris and JDPW on the assumption that JDPW was valid. Therefore, continuing to treat JDPW as valid preserves their expectations and the status quo, keeping them in the exact same position that they thought they were in all along.

55. Finally, it is also relevant that Plaintiffs might derive an "unfair advantage" from this new position. *Powell*, 364 N.C. at 569 (quoting *Whitacre P'ship*, 358 N.C. at 29). In resolving the first round of summary judgment motions, the Court dismissed the last of Plaintiffs' claims. It would be fundamentally unfair to allow Plaintiffs to breathe new life into their case by permitting them to raise a new position when their claims were already addressed on a contrary premise. They chose to proceed for years without investigating or raising this issue. It is now too late for Plaintiffs to advance their new and contradictory theory.

56.     In sum, this situation represents the very reason judicial estoppel exists: to protect the integrity of the judicial system and to facilitate consistency. *See Old Republic Nat'l Title Ins. Co. v. Hartford Fire Ins. Co.*, 369 N.C. 500, 506 (2017) (invoking judicial estoppel to prevent a party from relitigating matters on grounds it had previously abandoned and observing that a party may not "be allowed to blow hot and cold in the same breath" (quoting *Whitacre P'shp*, 358 N.C. at 12)); *Whitacre P'ship*, 358 N.C. at 26 (observing that "except in proper instances, a party to a suit should not be allowed to change his position with respect to a material matter in the course of litigation" because "a party 'cannot swap horses in midstream'" (quoting *Roberts v. Grogan*, 222 N.C. 30, 33 (1942))).

57.     Therefore, the Court concludes in its discretion that the doctrine of judicial estoppel bars Plaintiffs from denying the existence and validity of JDPW as an express trust.

58.     The remainder of Plaintiffs' motion is premised on JDPW's invalidity. Having concluded that Plaintiffs are judicially estopped from denying the existence and validity of JDPW as an express trust, Plaintiffs' other arguments are moot. The Court therefore denies Plaintiffs' motion for partial summary judgment.

## B. Motions as to the Receiver's Crossclaims

59.     The Receiver has moved for affirmative summary judgment as to his second through seventh crossclaims on JDPW's behalf against Doug Harris. (*See generally* Receiver's Mot. Summ. J.; Receiver's Br. Supp.) Doug Harris and the CM Defendants have also moved for summary judgment seeking dismissal of most of the Receiver's crossclaims against Doug Harris. Doug Harris seeks summary judgment as to the

Receiver's second, third, fourth, sixth, and seventh crossclaims. (*See* Harris Mot. Summ. J.; Harris Br. Supp. 2–3.) Similarly, the CM Defendants seek summary judgment on the Receiver's sixth, seventh, and eighth crossclaims to the extent they seek to set aside the transfer of the CM Note and CM Release Deed, as well as on any remaining claims by the Receiver to the extent they are asserted against the CM Defendants. (*See generally* CM Defs.' Mot. Summ. J.; CM Defs.' Br. Supp.)

### 1. *The Receiver's Crossclaims as to the CM Defendants*

60. The CM Defendants contend that the Receiver has asserted no crossclaims against them and seek summary judgment on any purported crossclaims on that basis. They argue that none of the crossclaims satisfy Rule 8's pleading standards because the CM Defendants are not mentioned in any of them. (*See* CM Defs.' Br. Supp. 8–9.) The Receiver does not address this argument in his brief, but the Court remains obligated to ascertain whether the CM Defendants have met their burden to obtain summary judgment.

61. Upon careful review, the Court disagrees that the CM Defendants should be dismissed from the crossclaims at this stage. Although the crossclaims at issue set forth Doug Harris's alleged misconduct, the relief the Receiver seeks directly implicates the CM Defendants. (*See, e.g.*, Receiver's Cross-cls. ¶¶ 481, 485, 496, 498–502.) Not only were the CM Defendants parties to some of the transactions at issue, but some of the property and obligations at issue are theirs too. For example, the CM Deed is to real property owned by the CM Defendants, and the CM Note is collectable against them. Because granting the relief the Receiver seeks would result in a

judgment implicating the CM Defendants, they are necessary parties to the claims. *See* N.C. R. Civ. P. 19(a); *Thomas v. Thomas*, 43 N.C. App. 638, 643 (1979) (observing that "the heart of the Rule lies in the proposition that all parties should be joined whose presence is necessary to a complete determination of the controversy").

62. The Court therefore concludes that while the Receiver's crossclaims do not directly allege wrongdoing by the CM Defendants, they are necessary parties because of the relief sought. Accordingly, it would be improper to dismiss them. The Court denies the CM Defendants' motion for summary judgment to the extent they seek dismissal of any crossclaim based on this argument.

2. *The Receiver's Second Crossclaim (Professional Negligence)*

63. The Receiver's second crossclaim is for professional negligence. (*See* Receiver's Cross-cls. ¶¶ 476–79.) Although the Receiver includes this claim in his motion, he does not advance any arguments in support. Instead, he focuses solely on his arguments that Doug Harris breached his duties as JDPW's trustee under the Uniform Trust Code, which is the subject of the Receiver's fourth crossclaim. Also, while Doug Harris and the CM Defendants purport to move for summary judgment on this claim, they have not advanced any specific arguments to support its dismissal. Accordingly, no moving party has met its burden to obtain summary judgment. *See* N.C. R. Civ. P. 56(c); *Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 555 (2020) ("The party moving for summary judgment has the burden of showing that there is no triable issue of material fact." (quoting *Nicholson v. Am. Safety Util. Corp.*, 346 N.C. 767, 774 (1997)). The Court therefore denies the Receiver's, Doug Harris's,

and the CM Defendants' motions for summary judgment as to the Receiver's second crossclaim for professional negligence.

3.  *The Receiver's Third Crossclaim (Breach of Fiduciary Duty/Constructive Fraud)*

64.    The Receiver's third crossclaim is for breach of fiduciary duty and constructive fraud.  (*See* Receiver's Cross-cls. ¶¶ 480–83.)  As an initial matter, to the extent the Receiver's claim is for constructive fraud, the Court denies the Receiver's, Doug Harris's, and the CM Defendants' motions for summary judgment.  Neither the Receiver nor the CM Defendants even address a purported constructive fraud crossclaim in their briefing or argument on the Motions.  And the argument Doug Harris advances is deficient.  Without citing any authorities, Doug Harris briefly argues that any constructive fraud claim fails because JDPW was not harmed by the transactions at issue.  (*See* Harris Opp'n Receiver's Mot. for Summ. J. 7–8, ECF No. 1394.)  But this argument is unpersuasive.  For one thing, as more thoroughly discussed elsewhere in this Order and Opinion, there is record evidence that JDPW did suffer harm because of Doug Harris's conduct.  And for another, our Supreme Court recently held that "potential liability for nominal damages is sufficient to establish the validity of claims for breach of fiduciary duty and constructive fraud and can support an award of punitive damages."  *Chisum v. Campagna*, 2021-NCSC-7, ¶ 44.  Thus, "the absence of evidence of actual damages does not defeat this claim." *Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at \*41 (N.C. Super. Ct. Apr. 1, 2021) (denying motion for summary judgment).

65. To the extent this claim is for breach of fiduciary duty, however, it overlaps to a degree with the Receiver's fourth crossclaim for breach of trustee duties. Therefore, the Court will analyze that part of the claim together with the breach of trustee duties claim in the next section. But to the extent this claim is premised on any other duty, the Court denies the Receiver's, Doug Harris's, and the CM Defendants' motions for summary judgment for the same reasons discussed with respect to the Receiver's second crossclaim.

### 4. The Receiver's Fourth Crossclaim (Breach of Trustee Duties)

66. The Receiver's fourth crossclaim asserts that Doug Harris committed a breach of trust by breaching his fiduciary duties to JDPW and its beneficiaries as JDPW's trustee. (*See* Receiver's Cross-cls. ¶¶ 484–87.) The Receiver on the one hand, and Doug Harris and the CM Defendants on the other, have each moved for summary judgment.

### a. The Receiver's Standing

67. The CM Defendants argue that the Receiver lacks standing to sue to void any transactions under N.C.G.S. § 36C-8-802(b). (*See* CM Defs.' Br. Supp. 6–8.) "[S]tanding is a 'necessary prerequisite to a court's proper exercise of subject matter jurisdiction.'" *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 611 (2018) (quoting *Willomere Cmty. Ass'n, Inc. v. City of Charlotte*, 370 N.C. 553, 561 (2018)). As such, the Court is obligated to satisfy itself that it has subject matter jurisdiction to hear the claims before it. *See* N.C. R. Civ. P. 12(h)(3); *In re T.R.P.*, 360 N.C. 588, 590 (2006); *McDaniel v. Saintsing*, 260 N.C. App. 229, 232 (2018).

68.     The CM Defendants point to the language in section 36C-8-802(b) providing that a conflict of interest transaction "is voidable *by a beneficiary* affected by the transaction[.]"   N.C.G.S. § 36C-8-802(b) (emphasis added).   Because the statute specifically identifies the affected beneficiaries as those who may seek to void the transaction, they contend that the statute limits the class of persons with standing and that the Receiver falls outside of that class.

69.     The Court disagrees.  When appointed, the Receiver was "vested with the full authority available to a receiver under North Carolina law *to serve as a quasi-trustee* acting for and under the direction of the Court to take control of and to administer the assets of JDPW[.]"  (JDPW Receiver Ord. 7 (emphasis added).)  The Receiver's equitable powers are broad.  *See, e.g.*, *Lambeth v. Lambeth*, 249 N.C. 315, 321 (1959) (recognizing the inherent authority of the Court to appoint receivers); *EHP Land Co. v. Bosher*, No. COA15-881, 2016 N.C. App. LEXIS 325, at *6 (N.C. Ct. App. Apr. 5, 2016) (observing that "the scope of a receiver's authority is circumscribed by the appointment of the court creating it" (citing *Harrison v. Brown*, 222 N.C. 610, 614 (1943))).  Those powers explicitly included the authority to "sue and defend in his own name as Receiver of [JDPW] in all courts of this State"; to "exercise all of the powers of [JDPW] through or in place of its Trustee, Douglas S. Harris, to the extent necessary to manage the affairs of [JDPW] *in the best interests of its beneficiary and creditors*"; and to "*seek to have set aside the transfer of any assets* of [JDPW] which the Receiver believes to have been improper."  (JDPW Receiver Ord. 8 (emphasis added).)

70.    As a quasi-trustee, the Receiver's powers undoubtedly extend to suing to void conflict of interest transactions under section 36C-8-802(b), and to suing for a breach of trust generally.  *See* N.C.G.S. § 36C-10-1001 official cmt. ("[C]otrustees have standing to bring a petition to remedy a breach of trust.  Following a successor trustee's acceptance of office, a successor trustee has standing to sue a predecessor for breach of trust.").[14]  The Receiver's broad powers under North Carolina statutory and common law enable him to step into the shoes of JDPW's former trustee and current beneficiaries and to assert claims accordingly.  Besides, even if section 36C-8-802(b) was not available to the Receiver, all of the relief the Receiver seeks is also available under section 36C-10-1001, which does not contain any language that might be interpreted as limiting standing to a trust's beneficiaries.[15]

---

[14] *See also* Restatement (Second) of Trusts § 200 cmt. a (noting that "a suit may be brought by one of several co-trustees against the other or others . . . or by a successor trustee against his predecessor"); Restatement (Second) § 200 cmt. f ("If the trustee commits a breach of trust and is thereafter removed as trustee or otherwise ceases to be trustee and a successor trustee is appointed, the successor trustee can maintain a suit against him to redress the breach of trust."); Restatement (Third) of Trusts § 94(1) ("A suit against a trustee of a private trust to enjoin or redress a breach of trust or otherwise to enforce the trust may be maintained only by a beneficiary or by a co-trustee, successor trustee, or other person acting on behalf of one or more beneficiaries."); Restatement (Third) of Trusts § 94 cmt. c ("If a trustee who commits a breach of trust is thereafter removed or otherwise ceases to serve as trustee, a successor trustee can maintain a suit against the former trustee . . . to redress the breach of trust. . . . If a trustee who commits a breach of trust is not removed but continues to serve as trustee, . . . a trustee ad litem may be appointed for that purpose.").

[15] At the hearing, the CM Defendants also suggested that the Receiver's authority is somehow limited because there is no evidence in the record that the Receiver has ascertained the identities of all of JDPW's purported beneficiaries or that all of the beneficiaries have consented to the Receiver's acting as a quasi-trustee.  These arguments have no merit.  While the Receiver's duties as receiver of JDPW arguably include ascertaining JDPW's beneficiaries and communicating with them as needed, an absence of evidence in the record that the Receiver has done so is not somehow proof that the Receiver is not properly carrying out his duties.  The CM Defendants' attempt to use lack of evidence as proof in this context is unpersuasive.  Further, with respect to the CM Defendants' contention that JDPW's

71.     Given the broad authority of receivers generally and the specific role of the Receiver as a quasi-trustee of JDPW, the Court is satisfied that the Receiver has standing to sue to void conflict of interest transactions under section 36C-8-802(b).

b.     Legal Standard for Trustee Duties

72.     Having concluded that the Receiver has standing to sue under section 36C-8-802(b), the Court turns to the merits of the Receiver's crossclaim on the undisputed evidence.  To establish a claim for breach of fiduciary duty, including a trustee's duty of loyalty, "a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff."[16]  *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019) (citing *Green v. Freeman*, 367

---

beneficiaries never gave consent to the Receiver's acting as quasi-trustee, this argument lacks merit for two reasons.  First, this was not one of the grounds on which the CM Defendants objected to the appointment of the Receiver over JDPW in the first place.  (*See generally* Obj. Castle McCulloch Defs. Nivison Pls.' Mot. Appointment Receiver JDPW Trust, ECF No. 342.)  The CM Defendants were on notice of this issue long ago and failed to timely raise it.  Second, the Court had the broad discretionary authority to remove Doug Harris as trustee and to appoint the Receiver as a special quasi-trustee with or without the beneficiaries' consent.  *See, e.g.*, N.C.G.S. § 36C-7-706(a), (b)(3)–(4) (providing that "a trustee may be removed by the court on its own initiative" if, among other things, (i) "[b]ecause of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries," or (ii) "[t]here has been a substantial change of circumstances, the court finds that removal of the trustee best serves the interests of all of the beneficiaries"); *id.* § 36C-7-704(e) ("Whether or not a vacancy in a trusteeship exists or is required to be filled, the court may appoint an additional trustee or special fiduciary whenever the court considers the appointment necessary for the administration of the trust.").

[16] Our Supreme Court recently clarified that "proof of actual injury" is not necessary "to support a claim for breach of fiduciary duty or constructive fraud."  *Chisum*, 2021-NCSC-7, ¶ 44.  Rather, "the incurrence of nominal damages" is sufficient and can support an award of punitive damages because nominal damages "reflect the existence of a legal harm and the fact that the policy of North Carolina law is to discourage breaches of fiduciary duty and acts of constructive fraud."  *Id.*

N.C. 136, 141 (2013)). Specifically, in the context of a trust, "[a] violation by a trustee of a duty the trustee owes under a trust is a breach of trust." N.C.G.S. § 36C-10-1001(a).

73. It is undisputed that Doug Harris owed a fiduciary duty of loyalty and trust as JDPW's trustee at all times relevant. *See* N.C.G.S. § 36C-8-802(a) (stating that a trustee owes a fiduciary duty to "administer the trust solely in the interests of the beneficiaries"); *In re Se. Eye Ctr.-Pending Matters*, 2019 NCBC LEXIS 29, at *177–78 ("[A] trustee under any trust is a fiduciary and owes certain duties to the beneficiaries of that trust." (citing N.C.G.S. §§ 32-2(a), 36C-8-802)).

74. Trustees are held to a high standard. They must "maintain complete loyalty to the interests of" the beneficiaries, *Wachovia Bank & Trust Co. v. Johnston*, 269 N.C. 701, 711 (1967), and they "can never paramount their personal interest over the interest of those for whom they have assumed to act[,]" *Miller v. McLean*, 252 N.C. 171, 174 (1960). That is, a trustee "is held to something stricter than the morals of the market place [sic]. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Johnston*, 269 N.C. at 711 (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, C.J.)).

75. One way a trustee commits a breach of trust is by entering into a conflict of interest transaction. A transaction involving the trust "entered into by the trustee for the trustee's own personal account, or that is otherwise affected by a conflict between the trustee's fiduciary and personal interests, is voidable by a beneficiary affected by the transaction, without regard to whether the transaction is fair to the

beneficiary[.]"  N.C.G.S. § 36C-8-802(b).  A conflict of interest can arise in many forms.  Of course, a transaction is tainted by a conflict of interest if the trustee himself has some personal interest or involvement in it.  *See id.*  Additionally, if a trustee enters into a transaction with a sibling (or other closely related persons), the transaction is "rebuttably presumed to be affected by a conflict of interest[.]"  *Id.* § 36C-8-802(c)(2).

76.     The trustee's duty of loyalty, while demanding, is justified:

> A man cannot serve two masters.  He cannot fairly act for his interest and the interest of others in the same transaction.  Consciously or unconsciously, he will favor one side or the other, and where placed in this position of temptation, there is always the danger that he will yield to the call of self-interest.

*Johnston*, 269 N.C. at 715; *see also THZ Holdings, LLC v. McCrea*, 231 N.C. App. 482, 487 (2013).  If a conflict of interest arises, a trustee has two choices.  He "must either remove the personal interest or resign his position as trustee." *In re Tr. Under Will of Jacobs*, 91 N.C. App. 138, 143 (1988).

c.  Analysis

77.     The Receiver has moved for summary judgment.  He contends that the undisputed record establishes that Doug Harris committed breaches of trust by entering into transactions that were (i) tainted by conflicts of interest, and (ii) not in the best interests of JDPW and its beneficiaries.  (*See* Receiver's Br. Supp. 4–7; Receiver's Reply Br. 3–4, 7, ECF No. 1410.)  Doug Harris and the CM Defendants oppose the motion and have also moved for summary judgment in their favor.  They contend that Doug Harris's conduct was not a breach of trust and that, regardless, he is entitled to certain safe-harbor protections under the Uniform Trust Code.

78. Upon careful review, the Court concludes that Doug Harris's conduct constituted a breach of trust as a matter of law. For the reasons discussed below, the undisputed record establishes that Doug Harris breached his fiduciary duties as JDPW's trustee by entering into conflict of interest transactions and by involving JDPW in transactions that were not in the best interests of JDPW or its beneficiaries.

79. The undisputed record establishes that, prior to bringing JDPW into the CM Defendants' refinancing plan, Doug Harris entered into personal arrangements to personally profit from JDPW's involvement in the refinancing plan. Under the Epes and McDaniel Agreements, Doug Harris obtained promises that he would be personally paid $1.3 million in exchange for causing JDPW to purchase the CM Loan from NewBridge. (*See* Epes Agrmt.; McDaniel Agrmt.; Harris Dep. 642:20–643:23.) At that point, Doug Harris had a conflict of interest: his personal financial stake in the refinancing versus his duties to JDPW as its trustee. Once Doug Harris obtained that financial stake, each transaction that followed was inherently and fundamentally tainted by that conflict of interest. Indeed, the record is replete with instances in which Doug Harris expressly admitted to having personal financial interests in the transactions. (*See, e.g.*, Harris Dep. 467:5–16, 812:5–7, 849:15–19, 849:24–850:12.)

80. Not only does the record establish Doug Harris's personal pecuniary interest, but it also reveals his personal familial interest. Richard Harris—Doug Harris's brother—was also involved in these transactions, both personally and through his two companies, Historic Castle and Castle McCulloch. Moreover, Doug

Harris represented Richard Harris as his attorney during the CM Defendants' refinancing negotiations. Again, the record is replete with examples of Richard Harris's role in the transactions, Doug Harris's relationship with him (both as his brother and his attorney), and actions Doug Harris took for Richard Harris's benefit (including using JDPW as a pass-through vehicle to direct funds to Richard Harris). (*See, e.g.*, Harris Dep. 38:24–39:11, 39:18–24, 40:2–11, 56:21–57:3, 229:1–25, 862:2–863:18, 864:17–865:16, 866:4–18.) As Doug Harris put it, "I was there to protect my brother's interest. I was retained by my brother. I went there to represent my brother." (Harris Dep. 57:12–14.)

81. These undisputed facts reveal Doug Harris's clear, unambiguous personal interest in the transactions he caused JDPW to enter into, including the Nivison Loan, JDPW's purchase of the CM Loan, and Doug Harris's transfers of the CM Note to Richard Harris and the CM Release Deed to Historic Castle. Indeed, his conflict of interest persists to this day: Doug Harris continues to maintain a claim with the Receiver for $1.3 million pursuant to the Epes and McDaniel Agreements. (*See* Harris Receivership Claim; Harris Dep. 467:5–16, 795:4–8; Harris Opp'n Receiver's Mot. Summ. J. 10, ECF No. 1394 ("Both contracts affirm that Doug Harris is owed $1.3 million.").)

82. Doug Harris's testimony shows that he subordinated JDPW's interests to those of others, including his own. As he stated at his deposition, "McDaniel and Dr. Epes needed some kind of vehicle" for the refinancing because otherwise, "they were going to have terrific taxes to pay." (Harris Dep. 829:17–20.) In addition, "they also

had the little side problem with me [Doug Harris]." (Harris Dep. 829:20–21.) As a result, Doug Harris saw JDPW as the "perfect go-between." (Harris Dep. 830:13–14.)

83. And the record makes undeniable that Doug Harris did not choose JDPW for the contemplated transactions to benefit the trust or out of loyalty to the trust. While he described the arrangement as a business opportunity for JDPW, (*see* Harris Dep. 829:4–6), Doug Harris testified that "there was no specialty in it being JDPW Trust. It could have been some individual. It could have been some corporation. [JDPW] just happened to be the one that came to mind . . . and I knew that it would work." (Harris Dep. 830:8–12.) JDPW was a prime candidate "since it had nothing, you know, it really didn't hurt anything." (Harris Dep. 830:12–13.) There was "[n]othing to lose. . . . just no muss, no fuss, you know." (Harris Dep. 830:15–19; *see also* Nivison Dep. 102:4–6 ("[M]y impression of JDPW Trust is that it was simply an empty vehicle being used for tax purposes.").)

84. This testimony both reiterates Doug Harris's many conflicts of interest and further demonstrates that his admitted purpose in involving JDPW in these transactions was to benefit himself and his brother, not JDPW. Indeed, the record makes plain that any possible benefit to JDPW was incidental and unintentional. Therefore, the undisputed evidence establishes that Doug Harris did not act in the best interests of JDPW and its beneficiaries.

85. Therefore, the Court concludes that the undisputed record establishes that Doug Harris committed a breach of trust by promising to cause JDPW to purchase the CM Loan in exchange for a personal payment to himself of $1.3 million. The

Court further concludes that the undisputed record establishes that, in light of Doug Harris's personal interests described above, each transaction that followed that was related to the refinancing plan was also tainted by those same conflicts of interest. The undisputed record, particularly through Doug Harris's own testimony, also establishes that Doug Harris did not act in the best interests of JDPW or its beneficiaries because he sought to use JDPW to benefit himself, his brother, and other parties without prioritizing JDPW, as required by law.

86.    The Court further concludes that the undisputed record establishes that Doug Harris committed a breach of trust by causing JDPW to take out the Nivison Loan.  To begin, this debt was incurred to facilitate JDPW's purchase of the CM Loan. (*See, e.g.*, 9AM Agrmt.; Am. Consolidated Compl. Exs. QQ, TT; Nivison Aff. ¶ 11; Harris Dep. 75:14–23, 79:11–25.)  Due to Doug Harris's personal interests as already described, this constituted a conflict of interest transaction.  *See THZ Holdings*, 231 N.C. App. at 486 (holding that trustee's interest in the transaction at issue made it "clearly" a conflict of interest transaction that was voidable "under the plain language of the statute"); N.C.G.S. § 36C-8-802(b).

87.    Moreover, causing JDPW to enter into the Nivison Loan was also a breach of trust because it is undisputed that the Nivison Loan was not taken out for any direct benefit to JDPW.  Instead, its purpose was to help Doug Harris and his brother achieve a favorable refinancing for their own affairs.  JDPW never benefitted from the Nivison Loan—nor could it have, since the entire plan, as Doug Harris testified, was to benefit everyone but JDPW and avoid appearances of tax impropriety.  (*See*

Harris Dep. 829:15–831:16.) Additionally, Doug Harris never made any effort to cause JDPW to repay the Nivison Loan or to assert JDPW's rights against the other persons who were purportedly obligated to repay the loan for JDPW. This resulted in JDPW's default on the Nivison Loan. (*See* Partial Summ. J. Ord. 1–2; Demand Letter; Harris Dep. 540:2–14.)

88. The Court further concludes that the undisputed record establishes that Doug Harris committed a breach of trust by transferring the CM Note to his brother and by transferring the CM Release Deed to Historic Castle, one of his brother's companies. (*See* ECF No. 1385.4; Harris Dep. 628:12–635:25, 866:19–868:25.) Due to Doug Harris's personal interests as already described, these transfers constituted conflict of interest transactions. *See THZ Holdings*, 231 N.C. App. at 486; N.C.G.S. § 36C-8-802(b).

89. Moreover, Doug Harris's transfers of the CM Note and the CM Release Deed were also breaches of trust because it is undisputed that those transfers were financially devastating to JDPW. As already stated, at the time of the transfers, JDPW was already in default on its obligations under the Nivison Loan because Doug Harris had made no attempts to repay that loan. (*See, e.g.*, Harris Dep. 540:2–21.) Doug Harris never took any actions to collect on the CM Note or to foreclose on the CM Deed. Accordingly, when Doug Harris transferred away the CM Note and the CM Release Deed, JDPW became insolvent. *See* N.C.G.S. § 39-23.2(a) ("A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."). In fact, Doug Harris transferred assets out of JDPW that—

according to his stated plan—might have facilitated a profit to JDPW in the form of the interest spread between the Nivison Loan and the CM Loan. (*See* Harris Dep. 829:7–14.)

90. Nowhere in any of his briefs does Doug Harris respond to the Receiver's argument that these transactions were tainted by several conflicts of interest. Indeed, the phrase "conflict of interest" does not appear in any of his briefs except in a single quote from some deposition testimony. (*See* Harris Opp'n Receiver's Mot. Summ. J. 1–11; Harris Br. Supp. 1–18; Harris Reply Br. 1–13, ECF No. 1407.) And the CM Defendants expressly concede the point. (*See* CM Defs.' Br. Supp. 4 ("Arguably, Doug Harris's transfer of the Castle McCulloch Note and release of the Castle McCulloch Collateral were presumably affected by a conflict of interest because the transactions were with Doug Harris's brother, Richard Harris.").)

91. The Receiver, therefore, has met his burden to show there is no genuine issue of material fact remaining on his third crossclaim for breach of fiduciary duty (to the extent premised on Doug Harris's duties as trustee) and his fourth crossclaim for breach of trustee duties against Doug Harris and that summary judgment for the Receiver and against Doug Harris on those crossclaims is proper as a matter of law. *See Pennington*, 356 N.C. at 579 ("If the movant successfully makes such a showing [of the absence of a genuine issue of material fact], the burden then shifts to the nonmovant to come forward with specific facts establishing the presence of a genuine factual dispute for trial."); *Steele v. Bowden*, 238 N.C. App. 566, 577 (2014) (observing that the nonmovant must "forecast sufficient evidence to show the existence of a

genuine issue of material fact in order to preclude an award of summary judgment");

N.C. R. Civ. P. 56(e) ("If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against him."); *rFactr, Inc. v. McDowell*, 2020 NCBC LEXIS 144, at \*41 (N.C. Super. Ct. Dec. 8, 2020) (granting summary judgment in favor of movant when nonmovant failed to respond to the argument).

d.  Defenses

92.    Although neither Doug Harris nor the CM Defendants rebut the Receiver's argument that the transactions were tainted by conflicts of interest, they raise several other arguments to oppose the Receiver's motion and to support their own motions seeking dismissal of the claim.  The Court will address each in turn.

93.    First, Doug Harris does not meaningfully argue that some question of fact precludes summary judgment.  Rather, he tries to justify his conduct by arguing that each individual transaction operated perfectly in accordance with the broader plan he envisaged with the CM Defendants, Dr. Epes, McDaniel, and Nivison.  Pointing to the transaction documents and to his own testimony and that of Turner and Nivison, he argues that it was never anyone's intention for JDPW to be liable on the Nivison Loan or for it to keep the CM Note and Collateral.  (*See* Harris Br. Supp. 4–9.)  He also argues that had JDPW kept the CM Note and Collateral, it would have amounted to "an astoundingly large windfall in exchange for the minor services that JDPW performed for the deal."  (Harris Br. Supp. 7.)

94.    But that is not the standard for a breach of trust.  Under the Uniform Trust Code, Doug Harris's conduct must be viewed through the lens of his duties to JDPW,

not in light of other persons' intent or their overall plan. The question is whether Doug Harris had a conflict of interest or otherwise failed to act in the best interests of JDPW and its beneficiaries. Doug Harris's argument fails to confront or meaningfully address those questions. The question of breach looks to Doug Harris's conduct vis-à-vis his duties to JDPW, not whether the plan "worked" vis-à-vis his personal interests and the other parties' intentions. Therefore, this argument does not present a jury question or provide a legal defense to liability.

95. Moreover, Doug Harris's argument that he did not commit a breach of trust because JDPW's enforcement of its rights to the CM Loan would amount to a "windfall" defies logic. Growing a trust's property and enforcing its rights is exactly what a trustee *should* do under the law. *See, e.g.*, N.C.G.S. §§ 36C-8-804 ("A trustee shall administer the trust as a prudent person would[.]"), 36C-8-811 ("A trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust."); *see also, e.g., id.* §§ 36C-9-901, 36C-9-902. The undisputed record shows that Doug Harris chose not to enforce JDPW's rights to the CM Loan or protect JDPW from default under the Nivison Loan so as to avoid harm to himself, his brother, his brother's companies, and the "master plan." In so doing, he ignored the reality that under the Uniform Trust Code, taking actions to benefit and protect JDPW was his lawful duty.

96. Doug Harris and the CM Defendants also argue that he did not commit a breach of trust with respect to the Nivison Loan because there was never any risk of harm to JDPW. They contend that the Assignment Agreement limited JDPW's

liability on the Nivison Loan to forfeiting certain equipment. (*See* 9AM Agrmt. § 5.) Because JDPW was never liable for the full amount, the argument goes, he did not breach his duties by exposing JDPW to more than $2.1 million in liability. (*See* Harris Br. Supp. 9–15; Harris Opp'n Receiver's Mot. Summ. J. 6; CM Defs.' Resp. Receiver's Mot. 1–3, ECF No 1390.)

97. As noted, the parties dispute which version of the Assignment Agreement controls, and only one version contains the limitation of liability provision. But taking the evidence in the light most favorable to Doug Harris and assuming the limitation of liability applies, Doug Harris's argument lacks merit for a more fundamental reason. As repeated many times in this Order and Opinion so far, a conflict of interest transaction is voidable regardless of its benefit—or as Doug Harris contends in this case, absence of harm—to the trust. The conflict of interest that permeated the Nivison Loan renders it a breach of trust without any need to assess the limitation of liability.

98. Doug Harris's entire defense can be summarized as this: he did not commit a breach of trust because JDPW was not harmed and because JDPW was limited to a passive role in a set of transactions to minimize taxes for other parties. On this basis, he contends that JDPW's interest in any assets that passed through it should be ignored because JDPW was just a vehicle—a tax shell. (*See* Harris Br. Supp. 4–9.) But his argument ignores the high standard to which a trustee is held. As the Receiver correctly points out, "Harris' obligation was not just to avoid harm to the

[JDPW] Trust. His obligation was to obtain those benefits that were available to the [JDPW] Trust." (Receiver's Reply Br. 7.)

99. Furthermore, if the Court were to accept this framing of the transactions, Doug Harris may stand to lose more than he stands to gain. The arrangement Doug Harris describes, if true, is suggestive of potential tax fraud. A longstanding principle of tax law is that transactions must have economic substance—that is, persons involved in a transaction must end up in different economic positions, and there must be a purpose to the transaction other than tax reduction or avoidance.[17] To accept Doug Harris's argument that JDPW was merely a tax shell to achieve tax avoidance would be akin to construing the parties' conduct as tax fraud. Engaging in tax fraud undoubtedly constitutes a breach of trust. Thus, even if the Court were to accept Doug Harris's overarching argument, it would simply lead to a *different* breach of trust: involving JDPW in a scheme to perpetrate federal and state tax crimes.

---

[17] As the United States Supreme Court has observed,

> taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary. In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding. Nor is the parties' desire to achieve a particular tax result necessarily relevant.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 572–73 (1978) (cleaned up); *see also Boulware v. United States*, 552 U.S. 421, 429–30 (2008).

100.  The CM Defendants and Doug Harris also attempt to excuse Doug Harris from liability in another way.  They argue that, even if Doug Harris's actions were tainted by conflicts of interest, they are nonetheless protected by certain safe harbors established by the Uniform Trust Code.  (*See* CM Defs.' Br. Supp. 4–6; Harris Br. Supp. 15–17.)  This argument also lacks merit.

101.  The Uniform Trust Code's safe harbors protect a trustee from liability in limited circumstances.  As relevant here, a conflict of interest transaction is not voidable if "[t]he terms of the trust authorized the transaction" or "[t]he beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee in compliance with G.S. 36C-10-1009[.]"  N.C.G.S. § 36C-8-802(b)(1), (4).  Also, a trustee is not liable for a breach of trust if (i) "the beneficiary consented to the conduct constituting the breach, released the trustee from liability for the breach, or ratified the transaction constituting the breach," or (ii) the trustee "act[ed] in reasonable reliance on the terms of the trust[.]"  *Id.* §§ 36C-10-1009(a), 36C-10-1006.

102.  Taken together, the Uniform Trust Code establishes two relevant protections.  A trustee's conduct cannot give rise to liability or voiding of transactions if either: (1) the beneficiaries consented to or ratified the transaction or released the trustee from liability, or (2) the terms of the trust authorized the transaction or the trustee reasonably relied on the terms of the trust.  On the undisputed record, though, neither of these safe harbors is available to Doug Harris.

103.  <u>Consent, Ratification, and Release.</u>  The record is undisputed that not all of JDPW's beneficiaries consented to or ratified the transactions or released Doug

Harris from liability. Therefore, this safe harbor does not protect Doug Harris. The CM Defendants argue that, at the time of the transactions, Doug Harris reasonably believed that Turner was JDPW's beneficiary. And according to Turner's testimony, she authorized and ratified Doug Harris's decision to transfer the CM Note to Richard Harris and the CM Release Deed to Historic Castle. (*See* Turner Dep. 125:3–126:12, ECF No. 1376.2; Aff. Kay Harris Turner Supp. Rule 60(b)(4)(5)(6) Mot. ¶¶ 14–18, ECF No. 1376.3.) The CM Defendants and Doug Harris contend that her authorization and ratification absolve Doug Harris.

104. In response, the Receiver argues that Turner's purported authorization and ratification were not effective for two independent reasons: (i) Turner was not a beneficiary of JDPW, and (ii) even if she was, none of the other beneficiaries consented to or ratified the transactions or released Doug Harris. (*See* Receiver's Reply Br. 5–6; Receiver's Br. Opposing Summ. J. Mots. Filed Doug Harris & CM Defs. ["Receiver's Opp'n"] at 11–12, ECF No. 1396.)

105. After careful review, the Court agrees with the Receiver. First, Turner was not a beneficiary of JDPW. Although the trust instrument designated Turner as JDPW's beneficiary upon Cox's death, Turner and Cox divorced after Cox executed the Trust Agreement. Divorce after execution of a revocable trust "revokes all provisions in the trust in favor of the settlor's former spouse[.]" N.C.G.S. § 36C-6-606. In that event, "[p]roperty prevented from passing to the former spouse because of revocation by divorce . . . passes as if the former spouse failed to survive the settlor, and other provisions conferring some power or office on the former spouse are

interpreted as if the former spouse failed to survive the settlor." *Id.* Thus, under section 36C-6-606, while divorce does not terminate a trust when its beneficiary is the former spouse, any property that would have passed to the former spouse instead passes to whomever the beneficiary would be had the spouse predeceased the settlor. Under this statute, then, Turner was no longer a beneficiary upon her subsequent divorce from Cox.

106. Doug Harris argues that Turner did not cease to be a beneficiary because Cox must have executed JDPW's Trust Agreement with knowledge that he and Turner were divorcing. (*See* Harris Reply Br. 12–13.) He points out that the Trust Agreement was executed on June 8, 2007, (*see* Tr. Agrmt. at 4), and that Cox and Turner's divorce was finalized only a few weeks later, on July 2, 2007, (*see* Aff. Kay Turner ["Turner Aff."] ¶ 3, ECF No. 1408.13). Turner testified that she and Cox had been separated for at least a year before he executed the Trust Agreement, and she had also filed for divorce at some unspecified time before execution of the Trust Agreement. (*See* Turner Aff. ¶ 3.) According to Doug Harris, this is evidence that Cox intended Turner to be JDPW's beneficiary regardless of their marital status. (*See also* Turner Aff. ¶ 4.)

107. But external evidence of Cox's intent cannot be considered because that intent was not expressed in the terms of the Trust Agreement. When a trust instrument is "in writing, and manifest[s] no ambiguity which would require resort to extrinsic evidence," the construction of the instrument is "for the Court." *Nevitt v.*

*Robotham*, 235 N.C. App. 333, 335 (2014) (cleaned up) (quoting *Atkinson v. Atkinson*, 225 N.C. 120, 124–25 (1945)).

108.   Section 36C-6-606 strictly provides that divorce revokes all provisions in favor of the former spouse.   By statute, therefore, the only exception to section 36C-6-606 is if the trust's terms explicitly provide otherwise.   *See* N.C.G.S. § 36C-1-105(b) (providing that "[t]he terms of a trust prevail over any provision in this Chapter except" certain enumerated exceptions not including section 36C-6-606).[18] The intent to override section 36C-6-606 must be expressed in the trust instrument. *See also Nevitt*, 235 N.C. App. at 336 (stating that in interpreting a trust instrument, "courts must give effect to the intent of the settlor, *so long as such intent does not conflict with the demands of law*" (emphasis added) (cleaned up)); *In re Ruth Cook Blue Living Tr.*, 2011 NCBC LEXIS 5, at *8 (N.C. Super. Ct. Mar. 8, 2011) ("The intent of one who creates a trust is to be determined *by the language chosen*[.]" (emphasis added) (citing *Callaham v. Newsom*, 251 N.C. 146, 149 (1959))).

109.   But the Trust Agreement contains no language suggesting any intent on Cox's part to override section 36C-6-606.   Had there been some ambiguity in the Trust Agreement suggesting Cox's possible intent, that might present a question of fact precluding summary judgment.   But the Trust Agreement's provisions addressing

---

[18] *See also* N.C.G.S. § 36C-6-606 official cmt. ("[Section 36C-6-606] tracks generally and makes applicable to revocable trusts the provisions of [N.C.]G.S. 31-5.4 revoking the provisions in a will in favor of the testator's former spouse upon the dissolution of the marriage by absolute divorce or annulment.   It does not bring forward the language in [N.C.]G.S. 31-5.4 that the revocation of the provisions in favor of the former spouse does not apply if the instrument provides otherwise.   This language was omitted in view of the general provision in [N.C.]G.S. 36C-1-105(b) that the terms of the trust prevail over any provision in Chapter 36C, subject to certain exceptions not applicable to [N.C.]G.S. 36C-6-606.").

beneficiaries are unambiguous on their face. And parol evidence—here, Turner's testimony about Cox's intent—cannot be considered when the Trust Agreement contains no ambiguity. Therefore, section 36C-6-606 strictly governs as a matter of law. Upon their divorce, Turner's status as a beneficiary was revoked, and any purported consent, ratification, or release by her after that point had no effect.[19]

110. Second, even if Turner was a beneficiary, her purported authorization and release would only absolve Doug Harris of liability to Turner, not to JDPW's other beneficiaries. Under the plain language of the Trust Agreement, Turner was not JDPW's only beneficiary. The Trust Agreement designates Turner as JDPW's primary beneficiary upon Cox's death but it further provides that "[a]t the death of [Turner], such property if any as survives in the trust shall be distributed to [Cox's] heirs at law." (Tr. Agrmt. ¶ XIII(R).) Under the Trust Agreement's unambiguous terms, therefore, Cox's heirs at law are contingent residuary beneficiaries of JDPW. *See Wachovia Bank & Tr. Co., N.A. v. Chambless*, 44 N.C. App. 95, 105–06 (1979) (first citing G. Bogert, The Law of Trusts and Trustees § 182, pp. 413–14 (Rev. 2d Ed. 1979); and then citing 13 Strong's N.C. Index 3d, Wills § 35.2 (1978)). As such, they

_____

[19] The parties have expressed uncertainty as to whether North Carolina or South Carolina law applies to the question of the effect of Cox and Turner's divorce. But the Court need not resolve that choice of law question because the result would be the same under either North Carolina or South Carolina law. Both states have adopted versions of the Uniform Trust Code, and the South Carolina Trust Code's provisions on this issue are substantially the same as those in the North Carolina Uniform Trust Code. *See* S.C. Code Ann. § 62-7-607 ("If after executing a revocable trust the settlor is divorced . . . , the divorce . . . revokes any disposition or appointment of property including beneficial interests made by such trust to the spouse . . . , unless the trust expressly provides otherwise. Property prevented from passing to a spouse because of revocation by divorce . . . passes as if the spouse failed to survive the settlor[.]"); *id.* § 62-7-105(b) (providing that "[t]he terms of a trust prevail over any provision of this article except" certain enumerated exceptions not including S.C. Code Ann. § 62-7-607).

are beneficiaries within the meaning of the Uniform Trust Code. *See* N.C.G.S. § 36C-1-103(3)(a) (defining a beneficiary as any person who "[h]as a present or *future beneficial interest* in a trust, vested or *contingent*" (emphasis added)).

111. Nothing in the Uniform Trust Code permits one beneficiary to unilaterally consent, ratify, or release on behalf of the rest of the trust's beneficiaries.[20] Therefore, even if Turner properly authorized and ratified the transactions, those acts were effective only as to her, not as to JDPW's remaining beneficiaries. Here, the record is undisputed that the only individual that possibly authorized and ratified the transaction was Turner. Because she is not the only beneficiary of JDPW (assuming for this purpose that she is one at all), her consent and ratification did not fully exonerate Doug Harris.

112. Therefore, even if Turner's authorization and ratification were valid as to her, the Receiver can still seek to remedy Doug Harris's breach of trust (i) as a quasi-

---

[20] This conclusion is reinforced by the operation of other parts of the Uniform Trust Code. Other statutes limit the class of beneficiaries needed to be involved in a particular trust action to "qualified beneficiaries," which do not include all contingent beneficiaries. *See* N.C.G.S. § 36C-1-103(15). For example, a trustee may resign if notice is given to all "qualified beneficiaries," not to every single beneficiary. *Id.* § 36C-7-705(a)(1). In contrast, the Uniform Trust Code provisions on consent, ratification, and release do not limit the required involvement to only qualified beneficiaries. Instead, all beneficiaries must be involved.

trustee of JDPW to remedy a prior trustee's breaches,[21] and (ii) on behalf of JDPW's other beneficiaries.[22]

113. The CM Defendants argue in a single sentence that Doug Harris's reasonable belief that Turner was JDPW's sole beneficiary is sufficient to excuse his failure to obtain consent from JDPW's other beneficiaries. (*See* CM Defs.' Br. Supp. 5.) They cite no authority for that proposition, however, and the Court's research reveals no caselaw or other authority suggesting that a nonbeneficiary's purported consent is effective for all trust beneficiaries if a trustee reasonably believes that person to be the sole beneficiary. Absent controlling authority establishing such an exception, the Court will not recognize one here.

114. Besides, no reasonable jury could find that Doug Harris's belief that Turner was the sole beneficiary was a reasonable belief. Section 36C-6-606 unambiguously provides for revocation of a former spouse's interest upon divorce. Doug Harris had a duty as trustee to know that. Additionally, the Trust Agreement clearly and unambiguously establishes other beneficiaries. The only way Doug Harris could have believed there were no other beneficiaries would have been by ignoring or failing to

---

[21] *See* N.C.G.S. § 36C-10-1001 official cmt. ("[A] successor trustee has standing to sue a predecessor for breach of trust."); Restatement (Second) of Trusts § 200 cmt. a (noting that "a suit may be brought by one of several co-trustees against the other or others . . . or by a successor trustee against his predecessor"); Restatement (Second) § 200 cmt. f ("If the trustee commits a breach of trust and is thereafter removed as trustee or otherwise ceases to be trustee and a successor trustee is appointed, the successor trustee can maintain a suit against him to redress the breach of trust.").

[22] *See* Receiver Order at 8 (granting the Receiver the authority to "exercise all of the powers of [JDPW] through or in place of its Trustee, Douglas S. Harris, to the extent necessary to manage the affairs of [JDPW] in the best interests of its beneficiary and creditors[,]" and to "seek to have set aside the transfer of any assets of [JDPW] which the Receiver believes to have been improper").

read the Trust Agreement's plain language. In sum, Doug Harris's subjective belief is irrelevant for purposes of consent, ratification, and release. And even were it relevant, it cannot be disputed on the record evidence that his belief was unreasonable.

115. <u>Terms of the Trust Instrument.</u> Nor may Doug Harris and the CM Defendants rely on the terms of the Trust Agreement to exonerate Doug Harris's actions. A conflict of interest transaction is not voidable if "[t]he terms of the trust authorized the transaction[,]" N.C.G.S. § 36C-8-802(b)(1), and a trustee is not liable for a breach of trust if he "act[ed] in reasonable reliance on the terms of the trust as expressed in a trust instrument[,]" *id.* § 36C-10-1006. Both of these sections look to the terms of the trust instrument itself.

116. The CM Defendants point to broad language in the Trust Agreement, contending that it "gave Doug Harris plenary authority to enter into transactions with Trust property." (CM Defs.' Br. Supp. 5.) It provides that Doug Harris's powers as trustee "include, but are not limited to . . . [t]he Power to manage the trust and the trust property therein as if the Trustee were the absolute owner of it[, and] [t]he Power to execute any documents necessary to administer any Trust created by this Declaration of Trust and to execute any documents on behalf of the Trust in the same manner as if the Trustee were the absolute owner of it." (Tr. Agrmt. ¶ XIII(B), (L).)

117. The Receiver argues that for the Trust Agreement to authorize a transaction within the meaning of section 36C-8-802(b)(2), the authority granted "would have to be specific enough to acknowledge the conflict of interest but approve the transaction

anyway—such as an express self-gifting power." (Receiver's Opp'n 15.) The Court agrees. For one thing, the language relied on by the CM Defendants is a boilerplate conferral of power, mirroring the Uniform Trust Code itself. *See* N.C.G.S. § 36C-8-815(a)(2)(a), (b) (conferring on a trustee "[a]ll powers over the trust property that an unmarried competent owner has over individually owned property" and "[a]ny other powers appropriate to achieve the proper investment, management, administration, or distribution of the trust property"); *see also Nevitt*, 235 N.C. App. at 335 (observing that when a trust instrument is "in writing, and manifest[s] no ambiguity which would require resort to extrinsic evidence," the construction of the instrument is "for the Court" (cleaned up)). Interpreting that language as the CM Defendants suggest would actually run contrary to other language in the Trust Agreement. (*See* Tr. Agrmt. ¶ XIII(O) ("Any income not spent for the benefit of the Grantor shall be accumulated and added to the Trust property.").)

118. Not only is the CM Defendants' interpretation contrary to the plain language of the Trust Agreement, but it is inconsistent with the Uniform Trust Code. Our state's appellate courts have not yet had occasion to provide explicit guidance on the meaning of section 36C-8-802(b)(2) or section 36C-10-1006 in this context. The Court is unaware of any reported decision from our state courts addressing what it means for the trust's terms to authorize a transaction or for the trust instrument to give rise to reasonable reliance. But by looking at our state courts' interpretation of the Uniform Trust Code in other circumstances and by considering decisions of other

states' courts on this issue, the Court concludes that the Trust Agreement cannot confer the broad protections the CM Defendants suggest.

119. First, the Trust Agreement does not explicitly authorize the transactions at issue. Explicit authorization arises in instances in which the settlor seeks to preemptively permit a particular transaction that would be a conflict of interest for the trustee. To permit the transaction but preempt liability, the settlor may include language in the trust instrument that specifically identifies the transaction or type of transaction and then authorizes the trustee to engage in it. *See, e.g.*, Restatement (Third) of Trusts § 78 cmt. c(2) ("For example, the terms of a trust may permit the trustee personally to purchase trust property or borrow trust funds, or to sell or lend the trustee's own property or funds to the trust.").

120. But explicit authorization does not give the trustee a blank check. The trustee must still comply with his overarching fiduciary duty to ensure that the transaction is in the best interests of the trust and its beneficiaries. Express authorization may nullify the particular conflict of interest, but the trustee's broader fiduciary duties are still preserved. *See id.* ("Even an express authorization of this type, however, would not completely dispense with the trustee's underlying fiduciary obligations to act in the interest of the beneficiaries and to exercise prudence in administering the trust. Accordingly, no matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly.").

121. Here, the Trust Agreement does not involve any such explicit authorization. It contains no language directly anticipating the transactions or types of transactions at issue and expressly approving of them. Perhaps recognizing this lack of express authority, Doug Harris and the CM Defendants argue the Trust Agreement should be interpreted as implicitly permitting Doug Harris's conduct. But they do not explain how and simply recite the language without meaningful analysis. As already noted, the Trust Agreement language amounts to nothing more than a boilerplate conferral of the regular and traditional powers of a trustee.

122. But even if the Court were to accept Doug Harris and the CM Defendants' interpretation that the Trust Agreement conferred substantial discretionary authority on JDPW's trustee, that language can only permit as much authority as allowed by law. And by law, a trust's terms cannot supersede a trustee's duties "to act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries" and cannot supersede "[t]he requirement that a trust and its terms be for the benefit of its beneficiaries[.]" N.C.G.S. § 36C-1-105(b)(2), (3). Additionally, "[a] term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that it relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries." *Id.* § 36C-10-1008.

123. The Uniform Trust Code even goes so far as to address purported conferrals of broad discretion on trustees. Indeed, even when a trust's terms confer broad discretion on a trustee, they do not give the trustee unfettered plenary power:

> Notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of terms such as "absolute", "sole", or "uncontrolled", a trustee abuses the trustee's discretion in exercising or failing to exercise a discretionary power if the trustee acts with bad faith, acts dishonestly, acts with an improper motive, even though not a dishonest motive, or if the trustee fails to use the trustee's judgment in accordance with the terms and purposes of the trust and the interests of the beneficiaries.

*Id.* § 36C-8-814(a).

124. These limitations are squarely applicable here. Even if the Trust Agreement implicitly granted Doug Harris broad authority to enter into *any* transaction, as he and the CM Defendants contend, the Uniform Trust Code does not allow any such authority to be exercised without restraint. Rather, the law—regardless of the terms of the trust instrument—restricts the trustee's power and preserves the trustee's underlying fiduciary duties to the trust and the beneficiaries. *See* N.C.G.S. § 36C-1-105(b). Whatever a trust's terms allow, a trustee's actions must still be for the benefit of the beneficiaries and the trust. As discussed at length above, it is undisputed that Doug Harris did not enter into the transactions for JDPW's or the beneficiaries' benefit but solely for his own benefit and the benefit of his brother and others. Therefore, no matter how the Trust Agreement is interpreted, Doug Harris's conduct violated his duties as JDPW's trustee.

125. This conclusion is reinforced by decisions from our state courts and from state courts around the country. In *THZ Holdings*, our Court of Appeals held that a trustee breached his duty of loyalty even though the trust instrument conveyed broad authority similar to that in JDPW's Trust Agreement. 231 N.C. App. at 483, 485–87. There, the trust instrument gave the trustee the power to "amend or terminate [the] agreement and direct distribution of the trust estate in such manner as . . . [the

trustee] deem[ed] advisable" and to "borrow money for any purpose, on such terms and from such source as the trustee deemed proper." *Id.* at 483 (internal quotation marks omitted). If anything, that language was even more broad and discretionary than that in JDPW's Trust Agreement. Yet even in the face of that broad authority, the Court of Appeals concluded that the trustee breached his duty of loyalty by discharging a debt owed to himself by the trust with trust property. *Id.* at 485–87. In doing so, the court also recognized that the "long-standing rule of our common law that trustees may not self-serve" is a duty separate and apart from section 36C-8-802's duty to avoid conflict of interest transactions. *Id.* at 487.

126. The Kansas Court of Appeals has recognized a very similar principle, holding that "[e]ven where the grantor intended the trustee to have as much power as possible over the trust, the law restricts that power." *Roenne v. Miller*, 475 P.3d 708, 716 (Kan. Ct. App. 2020). In *Roenne,* the court was confronted with a trustee's conduct when the terms of the trust gave him "uncontrolled discretion." *Id.* at 718. Interpreting the Kansas Uniform Trust Code (which is substantively the same as the North Carolina Uniform Trust Code[23]), the court held that "[w]hile a trust can eliminate strict prohibitions, such as that against self-dealing, it cannot eliminate the duty of loyalty. That limit preserves the fundamental fiduciary character of trust relationships recognized by law." *Id.* at 716. Even though the trust's terms expressly authorized the conflict of interest transaction at issue, the trustee's conduct still had to be viewed through the lens of whether the trustee "acted in good faith in the

---

[23] *Compare* N.C.G.S. §§ 36C-1-105(b)(2)–(3), 36C-8-802(b)(1), (4), 36C-8-814(a), 36C-10-1008, *with* Kan. Stat. Ann. §§ 58a-105(b)(2)–(3), 58a-802(b)(1), (4), 58a-814, 58a-1008(a)(1).

interests of the beneficiaries." *Id.* at 718. The "uncontrolled discretion" granted to the trustee "did not relieve him from his fiduciary duties as a trustee to act impartially in the interests of all the beneficiaries, rather than just himself. His fiduciary duties of loyalty and impartiality were limitations on his powers as trustee." *Id.* The court ultimately concluded that "[a] trustee, even one with great authority and discretion to act as [the trustee] did here, has the duty to act as a fiduciary to all the beneficiaries." *Id.*[24]

127. To conclude, no matter what the Trust Agreement might have implicitly authorized, Doug Harris's undisputed conduct is clearly forbidden by the Uniform Trust Code.

128. Similarly, Doug Harris could not have reasonably relied on the Trust Agreement's terms to carry out the acts in question. Had the Trust Agreement explicitly identified these transactions as permitted, it may have been reasonable for Doug Harris to have relied on that permission. But that is not the case here. In light of the high standards imposed on a trustee by the duty of loyalty, the Court concludes

---

[24] Courts in other states have come to similar conclusions. *See also, e.g.*, *Cassibry v. Cassibry*, 217 So. 3d 698, 706 (Miss. Ct. App. 2017) (holding that the same exception under the Mississippi Uniform Trust Code "would not permit a trustee to disregard completely his duties as a fiduciary"); *In re Beverly J. Laforest Living Tr.*, No. 323296, 2016 Mich. App. LEXIS 3, at *6 (Mich. Ct. App. Jan. 5, 2016) (holding that, under the same exception under the Michigan Trust Code, "[w]hile the trust granted appellant the power as trustee to make transfers of trust property, it did not grant her the right to engage in self-dealing"); *Mennen v. Wilmington Tr. Co.*, No. 8432-ML, 2015 Del. Ch. LEXIS 122, at *84–85 (Del. Ch. Apr. 24, 2015) (noting that "no matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly" (quoting Restatement (Third) of Trusts § 78 cmt. c(2))); *Hoffman v. First Va. Bank of Tidewater*, 263 S.E.2d 402, 408 (Va. 1980) (holding that when a trustee is granted "the widest possible discretionary powers[,]" such conferral does not permit actions taken if "the fiduciary acted dishonestly or in bad faith, or abused the discretion vested in it").

as a matter of law that no reasonable trustee could interpret the standard, boilerplate language in the Trust Agreement as authorizing the transactions at issue here.

129. Even if the Trust Agreement's language *could* have been a basis for reasonable reliance, the Court must reject the CM Defendants' argument for yet another reason: there is no evidence in the record of actual reliance by Doug Harris. The CM Defendants quote the statute but point to no evidence that Doug Harris actually relied on the Trust Agreement's terms. Doug Harris identifies no evidence either. Because Doug Harris and the CM Defendants have failed to offer evidence of Doug Harris's actual reliance on the Trust Agreement, they have failed to meet their burden to present or forecast sufficient evidence to create a genuine question of material fact. *See Vizant Techs.*, 373 N.C. at 555; *Steele*, 238 N.C. App. at 577. In light of the absence of any question of material fact, the Court concludes as a matter of law that Doug Harris and the CM Defendants have failed to show that Doug Harris is entitled to the reasonable reliance protection of section 36C-10-1006.

e. Conclusion

130. For all of the reasons stated, the Court concludes that the undisputed record establishes that the transactions discussed constituted breaches of trust by Doug Harris as conflict of interest transactions. Additionally, the Court concludes that the undisputed record establishes that these transactions constituted breaches of trust by Doug Harris separate and apart from their status as conflict of interest transactions. The Receiver has met his burden to establish that there is no genuine issue of material fact remaining for trial and that summary judgment is proper on

those issues as a matter of law. Doug Harris and the CM Defendants have not presented or forecasted any evidence rebutting the transactions' status as conflict of interest transactions or explaining how the transactions were in the best interests of JDPW and its beneficiaries. Therefore, judgment is appropriate as a matter of law.

131. The Court grants the Receiver's motion for partial summary judgment as to the Receiver's third crossclaim for breach of fiduciary duty to the extent it is premised on Doug Harris's duties as trustee and as to the Receiver's fourth crossclaim for breach of trustee duties. The Court denies Doug Harris's and the CM Defendants' motions for partial summary judgment as to the same crossclaims.

f. Remedies

132. Having concluded that summary judgment is proper on these claims, the Court now turns to the relief the Receiver seeks. *See Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 676 (1978) ("Under Rule 56(d) summary judgment may be granted, not only as to an issue of liability, but also as to 'the amount of damages or other relief' where such issues are not in controversy." (quoting N.C. R. Civ. P. 56(d))).

133. The Court possesses broad authority to remedy a trustee's misconduct. To begin, any conflict of interest transaction is automatically voidable. *See* N.C.G.S. § 36C-8-802(b); *THZ Holdings*, 231 N.C. App. at 488. The plaintiff need not establish that there was fraud or that the transaction was unfair, only that there was a conflict of interest. *See id.* § 36C-8-802(b) (stating that a conflict of interest transaction is voidable "without regard to whether the transaction is fair"); *Johnston*, 269 N.C. at

710–11 ("It is an inflexible rule, that when a trustee buys at his own sale, even if he gives a fair price, the *cestui que trust* has his election to treat that sale as a nullity, not because *there is* but because there *may be* fraud." (quoting *Brothers v. Brothers*, 42 N.C. 150, 151 (1850))).

134.  Section 36C-8-802 provides this one specific remedy for conflict of interest transactions, but the Uniform Trust Code also grants the Court broad power to take a number of actions "[t]o remedy a breach of trust that has occurred or may occur[.]" N.C.G.S. § 36C-10-1001(b).  Among other things, the court may:

> (3) Compel the trustee to redress a breach of trust by paying money, restoring property, or other means;
>  . . . .
> (9) Subject to [N.C.]G.S. 36C-10-1012, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds; or
> (10) Order any other appropriate relief.

*Id.* § 36C-10-1001(b)(3), (9), (10).

135.  Voiding or rescinding transactions is therefore not the only remedy.  The breaching trustee himself is also personally liable for his conduct.  "A trustee who commits a breach of trust is liable for the greater of: (1) [t]he amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) [t]he profit the trustee made by reason of the breach."  *Id.* § 36C-10-1002(a); *see also id.* § 36C-10-1010(b) ("A trustee is personally liable for torts committed in the course of administering a trust, or for obligations arising from ownership or control of trust property . . . if the trustee is personally at fault.").

136. The Receiver's motion seeks three types of relief at this time. First, the Receiver requests that the Court set aside Doug Harris's transfer of the CM Note to Richard Harris and his transfer of the CM Release Deed to Historic Castle. Second, the Receiver requests that the Court enter a money judgment in JDPW's favor against Doug Harris for: (i) the full amount due to Plaintiffs on the Nivison Loan, (ii) the amount of the interest spread that JDPW should have earned under the deal as envisaged by Doug Harris, and (iii) the $1.3 million due and payable on the CM Note over and above the $2.1 million JDPW borrowed from Plaintiffs. Third, the Receiver requests that the Court enter judgment declaring Doug Harris has no personal right to the $1.3 million under the Epes and McDaniel Agreements and setting aside Doug Harris's asserted claim for that amount. (*See* Receiver's Mot. Summ. J. 3–4; Receiver's Br. Supp. 4–7.) The Court concludes that, as a matter of law and on the undisputed record, summary judgment is appropriate with respect to certain portions of the relief requested as set forth below.

137. <u>Voiding the Transfers of the CM Note and CM Release Deed.</u> First, the Court grants JDPW's request to set aside Doug Harris's transfer of the CM Note to Richard Harris and his transfer of the CM Release Deed to Historic Castle. The Court has determined that these transfers were conflict of interest transactions. As such, they are voidable "under the plain language of the statute." *THZ Holdings*, 231 N.C. App. at 486; *see also* N.C.G.S. § 36C-8-802(b). Accordingly, voiding these transfers is plainly authorized by law in this situation.

138. Voiding these transfers is also authorized by section 36C-10-1001(b) as a means of redressing Doug Harris's breach of trust. As previously observed, that statute independently authorizes the Court to remedy any breach of trust—whether a conflict of interest transaction or otherwise—by voiding a trustee's act, tracing trust property wrongfully disposed of, recovering the property or its proceeds, and ordering any other appropriate relief. *See id.* § 36C-10-1001(b)(9), (10).

139. Accordingly, pursuant to sections 36C-8-802(b) and 36C-10-1001(b) (each as independent grounds for relief), the Court will void these transfers and order the CM Defendants to take any and all lawful action necessary to restore the CM Note and Collateral to JDPW's possession.

140. <u>Monetary Judgment Against Doug Harris.</u> Second, the Court grants JDPW's request to enter a money judgment in JDPW's favor against Doug Harris for: (i) the full amount JDPW owes to Plaintiffs on the Nivison Loan and (ii) the $1.3 million due and payable on the CM Note over and above the $2.1 million JDPW borrowed under the Nivison Loan. As already observed, the Court may "[c]ompel the trustee to redress a breach of trust by paying money, restoring property, or other means[.]" N.C.G.S. § 36C-10-1001(b)(3); *see also id.* § 36C-10-1002(a) ("A trustee who commits a breach of trust is liable for the greater of: (1) [t]he amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) [t]he profit the trustee made by reason of the breach."); *id.* § 36C-10-1010(b) ("A trustee is personally liable for torts

committed in the course of administering a trust, or for obligations arising from ownership or control of trust property . . . if the trustee is personally at fault.").

141. As already discussed, Doug Harris committed a breach of trust by incurring the Nivison Loan on JDPW's behalf, both because it was a conflict of interest transaction and because it was not in the best interests of JDPW or its beneficiaries. Because of Doug Harris's personal involvement and entanglement in the loan and affiliated transactions (including his side arrangements to personally profit from causing JDPW to take out the Nivison Loan and purchase the CM Loan), the undisputed record demonstrates that Doug Harris is personally at fault. Accordingly, the Court concludes that Doug Harris is personally liable to JDPW for the full amount JDPW owes Plaintiffs on the Nivison Loan.

142. In addition, JDPW is entitled to a monetary judgment against Doug Harris for the $1.3 million due and payable on the CM Note over and above the amount JDPW borrowed from Plaintiffs via the Nivison Loan. Had Doug Harris not committed a breach by transferring away the CM Note and Release Deed and failing to enforce JDPW's rights to the CM Loan, JDPW would not only have been able to repay the Nivison Loan, but it would have also profited from the CM Loan by receiving the difference ($1.3 million) between what JDPW could have collected on the CM Loan and what it owed on the Nivison Loan. But instead, Doug Harris arranged to receive that amount for himself personally through other channels, pursuant to the Epes and McDaniel Agreements. Thus, even absent a breach of trust, Doug Harris may be held personally liable for that amount. *See* N.C.G.S. § 36C-10-

1003(a) ("A trustee is accountable for any profit made by the trustee arising from the administration of the trust, even absent a breach of trust.").

143. Therefore, Doug Harris may be held personally liable for this amount to the extent that JDPW is unable to recover the full amount on the CM Loan once the transfers of the CM Note and CM Release Deed are voided.

144. However, the Court concludes that JDPW is not entitled to a monetary judgment against Doug Harris for the amount of the potential interest spread that JDPW might have earned. The Receiver argues that JDPW should have earned a profit from these transactions in the form of a two percent interest spread on the difference between the rates of the CM Loan and the Nivison Loan, but that the spread never materialized because Doug Harris never sought to collect on the CM Loan. But awarding JDPW the amount of the interest spread would be a form of double recovery because the trust will already be made whole by the other forms of relief sought—namely, by recovering the amount it had to pay (i.e., the Nivison Loan) and the value of what it lost (i.e., the CM Loan), less the value it will obtain from voiding the transfers of the CM Note and CM Release Deed. *See, e.g.*, *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 138 (2000) (noting that "[i]t is well-settled that although [plaintiff] is entitled to full recovery for its damages, [plaintiff] is not entitled to a 'double recovery' for the same loss or injury" (quoting *Markham v. Nationwide Mut. Fire Ins. Co.*, 125 N.C. App. 443, 455 (1997)).

145. <u>Setting Aside Doug Harris's Personal Claim to $1.3 Million.</u> Finally, the Court grants JDPW's request to enter judgment declaring Doug Harris has no

personal right to $1.3 million under the Epes and McDaniel Agreements and setting aside Doug Harris's asserted claim for that amount. As the Court has already concluded, Doug Harris's conduct in arranging to receive $1.3 million under the Epes and McDaniel Agreements through his use of JDPW was a breach of trust as a conflict of interest transaction. Through those agreements, Doug Harris endeavored to personally profit from his role as JDPW's trustee at the expense of the trust. To allow Doug Harris to continue to assert this personal interest would perpetuate his misconduct and enable him to personally profit from his wrongdoing. As noted above, a trustee is not permitted to personally profit from his administration of a trust, even in the absence of a breach of trust. *See* N.C.G.S. § 36C-10-1003(a). Accordingly, under all of the authorities discussed above, the Court determines that Doug Harris's breach should be further remedied by preventing him from asserting any personal financial stake in the CM Loan or related transactions. Thus, the Court will enter judgment declaring that Doug Harris has no personal right to any amounts arising out of these transactions.

146. Doug Harris asserted a claim with the Receiver for this $1.3 million (plus eight percent interest) pursuant to the Epes and McDaniel Agreements. (*See* Harris Receivership Claim.) Accordingly, the Court will enter judgment dismissing and setting aside that claim and voiding Doug Harris's personal interest in the two confessions of judgment provided him under the Epes and McDaniel Agreements.

*5.* *The Receiver's Fifth Crossclaim (Section 75-1.1)*

147. JDPW seeks summary judgment as to the Receiver's fifth crossclaim for unfair or deceptive trade practices under N.C.G.S. § 75-1.1, but its brief makes no argument on this claim. Also, the Court has already dismissed this claim in its entirety. *See In re Se. Eye Ctr.-Pending Matters*, 2019 NCBC LEXIS 29, at *180–82, *195. The Court therefore denies as moot JDPW's motion for partial summary judgment as to the Receiver's fifth crossclaim.

*6.* *The Receiver's Sixth and Seventh Crossclaims (Equitable Relief)*

148. The Receiver's sixth and seventh crossclaims are broad and seek a host of equitable relief. But JDPW's motion simply seeks the same relief under these crossclaims that the Court has already granted in this Order and Opinion under the Receiver's third and fourth crossclaims. The Court therefore denies as moot JDPW's affirmative motion for partial summary judgment on the Receiver's sixth and seventh crossclaims.

149. Dismissing these two claims entirely, as Doug Harris and the CM Defendants request in their motions, however, is not proper. As the Court has observed, an equitable remedy is not available "where the party seeking it has a full and complete remedy at law." *Id.* at *183 (quoting *Daugherty v. Cherry Hosp.*, 195 N.C. App. 97, 102 (2009)). An adequate remedy at law "is not a partial remedy" but "a full and complete remedy, and one that is accommodated to the wrong which is to be redressed by it." *Id.* (quoting *Moore v. Moore*, 297 N.C. 14, 16 (1979)). "Thus, to preclude the availability of equitable relief, the remedy available at law 'must be as

practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.' " *Id.* at \*183–84 (quoting *Moore*, 297 N.C. at 16).

150. Doug Harris moved for summary judgment on these claims once before. In denying his motion then, the Court observed that "[t]he insolvency of multiple parties, and the resulting importance of their physical assets and other collateral, has been a common thread running throughout this case." *Id.* at \*184. Even if some of the Receiver's crossclaims were successful, the Court at that time was "not convinced, on the current record, that such relief will be full and complete or fully collectable." *Id.* This remains true. Although the Court has now granted partial summary judgment in the Receiver's favor on his third and fourth crossclaims, other claims and matters are still unresolved. Doug Harris and the CM Defendants have not shown at this stage that the Receiver's potential remedies at law are fully adequate. The Court therefore denies Doug Harris's and the CM Defendants' motions for summary judgment as to the Receiver's sixth and seventh crossclaims.

**7. _The Receiver's Eighth Crossclaim (All Other Causes of Action)_**

151. The CM Defendants seek summary judgment on the Receiver's eighth crossclaim on the same grounds that the Court already dismissed that crossclaim against Doug Harris. (*See* CM Defs.' Br. Supp. 8–9.) JDPW's brief makes no response. As the Court previously observed, this crossclaim "asserts nothing more than a general right to recover under 'all other causes of action allowed by North Carolina or federal law[.]' " *In re Southeastern Eye Center-Pending Matters*, 2019 NCBC LEXIS 29, at \*188 (citing Receiver's Cross-cls. ¶ 503). Simply put, it "does not

make out any legally cognizable claim against [the CM Defendants] and is not sufficiently stated to allow an adverse party in [the CM Defendants'] position to understand the nature of the claim brought[.]" *Id.* Accordingly, the Court concludes that just as the Receiver failed to state a claim under this count against Doug Harris, so too has the Receiver failed to state a claim against the CM Defendants in his eighth crossclaim. The Court therefore grants the CM Defendants' motion for summary judgment as to the Receiver's eighth crossclaim.

## C. The CM Defendants' Motion as to Their Crossclaims

152. The CM Defendants' motion also seeks affirmative summary judgment as to several of their own crossclaims for surety, indemnity, and contribution. (*See* CM Defs.' Br. Supp. 9–13; *see also* Def. Richard A. Harris's 2d Am. Cross-cls. ¶¶ 402–08, 415–28, ECF No. 852; Def. Castle McCulloch, Inc.'s 2d Am. Cross-cls. ¶¶ 402–08, 415–28, ECF No. 853; Def. Historic Castle McCulloch, LL's 2d Am. Cross-cls. ¶¶ 402–08, 415–28, ECF No. 855.) The Receiver and Dr. Epes oppose the motion. (*See* Receiver's Opp'n 16–17; Opp'n Dr. C. Richard Epes Castle McCulloch Defs.' Summ. J. Mot., ECF No. 1395.)

153. There seems to be some confusion as to what contracts the CM Defendants premise these claims on, since the documents they attach to their motion do not appear to fully match those attached to their pleadings. But regardless, summary judgment is not proper because none of these claims has yet accrued.

154. A surety contract "involves a direct promise to perform the obligation of the principal in the event the principal fails to perform[.]" *New Amsterdam Cas. Co. v. Waller*, 233 N.C. 536, 538 (1951). An indemnity agreement "obligates the indemnitor

to reimburse his indemnitee for loss suffered or to save him harmless from liability, but never directly to perform the obligation indemnified." *Id.* And separate from the right to contribution in tort, co-obligors have a right to contribution when they are jointly and severally liable. *See* N.C.G.S. §§ 26-5, 1B-7; *Coll. Rd. Animal Hosp., PLLC v. Cottrell*, 236 N.C. App. 259, 263–64 (2014); *Irvin v. Egerton*, 122 N.C. App. 499, 501 (1996).

155. The parties dispute whether the CM Defendants even have a contractual right to indemnity, surety, or contribution. But the Court need not reach those issues because no claim has yet accrued. A cause of action for indemnity does not accrue until the indemnitee suffers actual loss. *See Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 267 (2006), *aff'd*, 362 N.C. 269 (2008). Similarly, a cause of action for surety does not accrue until the making of a demand or the rendition of a judgment. *See George v. Hartford Accident & Indem. Co.*, 102 N.C. App. 761, 765 (1991), *aff'd as modified on other grounds*, 330 N.C. 755 (1992). And a cause of action for contribution does not accrue until the contributee has paid or discharged the obligation. *See Irvin*, 122 N.C. App. at 501.

156. The CM Defendants have not presented or forecasted any evidence that they have suffered any loss, that a judgment has been entered against them, or that they have paid or discharged any obligation in full. Thus, none of the CM Defendants' crossclaims are ripe. The Court therefore denies the CM Defendants' motion for summary judgment as to their crossclaims for indemnity, surety, and contribution.

IV.
CONCLUSION

157. **WHEREFORE**, the Court hereby **ORDERS** as follows:

158. Plaintiffs' motion for partial summary judgment is **DENIED**.

159. Doug Harris's motion for summary judgment is **DENIED**.

160. The CM Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part** as follows:

a. To the extent the CM Defendants' motion requests summary judgment on the Receiver's eighth crossclaim against the CM Defendants, the motion is **GRANTED**, and that claim is dismissed with prejudice.

b. In all other respects, the motion is **DENIED**.

161. The Receiver's motion for partial summary judgment is **GRANTED in part** and **DENIED in part** as follows:

a. To the extent the Receiver's motion requests summary judgment on the Receiver's second crossclaim for professional negligence and third crossclaim to the extent it is premised on grounds other than Doug Harris's duties as trustee of JDPW, the motion is **DENIED**.

b. To the extent the Receiver's motion requests summary judgment on the Receiver's fifth crossclaim for unfair or deceptive trade practices, sixth crossclaim for equitable relief, and seventh crossclaim to set aside Doug Harris's transfers of the CM Note and CM Release Deed, the motion is **DENIED as moot**.

c. To the extent the Receiver's motion requests summary judgment on the Receiver's third crossclaim to the extent it is premised on Doug Harris's duties as trustee of JDPW and fourth crossclaim for breach of trustee duties, the motion is **GRANTED**, and the Court hereby enters judgment for JDPW, through the Receiver, and against Doug Harris as to liability on those claims.

162. Pursuant to the Court's authority under the Uniform Trust Code to order appropriate relief to remedy a trustee's breach of trust, and pursuant to the judgment entered on the Receiver's third and fourth crossclaims, the Court hereby further **ORDERS** as follows:

a. Doug Harris's transfer of the CM Release Deed to Historic Castle is hereby **VOIDED**, **RESCINDED**, and **SET ASIDE**. Historic Castle shall take any and all lawful action necessary to restore to JDPW (through the Receiver) all right, title, and interest it formerly held to the CM Collateral before the CM Collateral was released by the CM Release Deed.

b. Doug Harris's transfer of the CM Note to Richard Harris is hereby **VOIDED**, **RESCINDED**, and **SET ASIDE**. Richard Harris shall take any and all lawful action necessary to restore to JDPW (through the Receiver) all right, title, and interest it formerly held to the CM Note before the CM Note was transferred to Richard Harris. JDPW shall be

entitled to the full amount due and payable on the CM Note at the time of the transfer.

c. The Court hereby **ENTERS JUDGMENT** establishing liability against Doug Harris personally for the full amount JDPW owes Plaintiffs on the Nivison Loan. The Court will defer consideration of a monetary judgment resulting from this liability until factual determinations are made at trial that bear on the specific amount that Doug Harris may owe as a result of his conduct in connection with the Nivison Loan.

d. The Court hereby **ENTERS JUDGMENT** establishing liability against Doug Harris personally for the full amount JDPW is owed on the CM Loan less any sums JDPW realizes upon the voiding of transfers of the CM Note and CM Release Deed. The Court will defer further proceedings in connection with this issue until a request for a monetary judgment is presented by proper motion, briefing, and presentation of evidence.

e. The Court hereby **DECLARES** that Doug Harris shall not be entitled to any claim or interest to personally collect any amounts due to him under the Epes Agreement or the McDaniel Agreement or under any other agreement—implied or express—stemming from those agreements. The Court **DISMISSES** and **SETS ASIDE** the claim Doug Harris has asserted with the Receiver for $1,300,000.00 plus eight percent interest. The Court **VOIDS** any right or interest Doug Harris

has or may assert to the two confessions of judgment provided to him under the Epes Agreement and the McDaniel Agreement.

f.  The Court retains jurisdiction to enter any additional orders as needed and appropriate to facilitate and further effectuate the relief granted herein.

**SO ORDERED**, this the 6th day of January, 2022.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge